# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **GEORGE R. HUGHES,** |
| **Plaintiff,** |
| **v.** |
| **VINCENT ABELL, et al.,** |
| **Defendants.** |

**Civil Action No. 09-220 (JDB)**

## MEMORANDUM OPINION

Plaintiff George R. Hughes brings this action against Vincent Abell, Calvin Baltimore, Modern Management Company ("Modern Management"), and Wells Fargo Bank ("Wells Fargo"). With respect to Abell, Baltimore, and Modern Management, Hughes alleges violations of the D.C. Consumer Protection Procedures Act ("CPPA"), the Truth in Lending Act ("TILA") and the Home Ownership and Equity Protection Act ("HOEPA"), common law fraud, usury, and a claim for an equitable mortgage. As to Wells Fargo, Hughes alleges violations of CPPA and a common law negligence claim. And as against both Abell and Wells Fargo, Hughes seeks to quiet title to his primary residence after refinancing his mortgage.

Hughes alleges that while he believed he was securing a loan to save his home from foreclosure, in fact, Abell, Baltimore, and Modern Management engaged in a scheme to defraud Hughes of his home. Arising from a separate transaction, Hughes alleges that Wells Fargo provided him financing on unconscionable terms and misrepresented material facts. Now before the Court are Abell's motion to dismiss and motion for partial summary judgment, and Wells Fargo's motion to dismiss for unclean hands and for failure to state a claim pursuant to Fed. R.

Civ. P. 12(b)(6). For the reasons discussed below, Abell's motions will be granted in part and denied in part, and Wells Fargo's motion will be denied.

<h2 style="text-align:center"><u>BACKGROUND</u></h2>

This Court previously ruled on Wells Fargo's motion to dismiss Hughes's original complaint. <u>Hughes v. Abell</u>, 624 F. Supp. 2d 110 (D.D.C. 2009). There, the Court ruled that Hughes had alleged facts sufficient to state an unconscionability claim under the CPPA, and that Hughes's quiet title count also survived. Wells Fargo's motion to dismiss was, however, granted in part, because Hughes failed to adequately allege misrepresentation under the CPPA. Plaintiffs were granted leave to file an amended complaint, and did so. The alleged facts, however, have remained largely the same.

Hughes purchased 5236 5th Street NW, Washington, DC ("the Property") in November 1997. Am. Compl. ¶¶ 4, 9. He took out two mortgages against the Property in order to pay for it, the larger of the two from Chase Manhattan Bank. <u>Id.</u> ¶¶ 10, 12. After Hughes became delinquent on the larger loan in 2004, Chase Manhattan notified Hughes that it would foreclose. <u>Id.</u> ¶¶ 13, 14. Hughes needed to pay arrears in the amount of $16,485.51, plus costs and fees, to prevent the auction of his home in September 2004. <u>Id.</u> ¶ 4. Prior to foreclosure, Baltimore, working with Abell and Modern Management, solicited Hughes's business and represented that he would help Hughes remain in his home. <u>Id.</u> ¶¶ 15–17, 24. Hughes signed a series of documents, the effect of which was to transfer title to the property to Abell, who then rented it back to Hughes. <u>Id.</u> ¶¶ 20, 25. Hughes alleges that he understood the transaction "as a way to retain ownership of his home." <u>Id.</u> ¶ 24.

The only paper Baltimore provided Hughes at the end of the transaction was a lease

agreement.  Id. ¶ 21.  Baltimore told Hughes that he would provide him with copies of the other

papers, but never did, despite Hughes's repeated attempts to contact Baltimore and obtain copies.

Id.  The lease agreement provided that Hughes would pay $1034.76 per month, which Hughes

alleges that he believed would "cover his mortgage as well as the loan."  Id. ¶ 20. Attached to the

lease was an "Option Agreement" that provided that Hughes could purchase his home for

$75,000.00 within the next year.  Id.  ¶ 22. Baltimore explained that Modern Management would

help Hughes refinance the loan at the end of the year.  Id. ¶ 20. Hughes also received $10,000.00

as part of this transaction.  Id.  Assuming Hughes borrowed $30,000 under this loan -- the

$10,000 payment and approximately $20,000 to cover arrears -- the annual percentage rate would

have been 122.57%, based on twelve monthly payments of $1034.76 and a final payment of

$75,000.  Id. ¶ 23. At the time of this transaction in September 2004, the property was worth

$147,060, according to D.C. property tax assessment records.  Id. ¶ 24.

Around August 2006, Hughes received notice from Chase Manhattan that it had changed

his contact information to that of the offices of Modern Management.  Id. ¶ 29.  He also received

notice from Modern Management that he was behind in his payments.  Id. ¶ 30.  Sensing

problems with Modern Management and with Chase Manhattan, which he "believed to be

connected to Modern Management," Hughes approached defendant Wells Fargo to seek

refinancing of his Chase Manhattan mortgage.  Id. ¶¶ 31, 32.  Wells Fargo offered to refinance

his Chase Manhattan mortgage so long as Hughes consolidated his second mortgage and other,

nonmortgage debts, which together totaled $33,517.03, into his agreement with Wells Fargo.  Id.

¶¶ 33, 36.  The statute of limitations had passed for some of these nonmortgage debts.  Id. ¶ 35.

Hughes's outstanding balance on his Chase Manhattan mortgage was $87,775.43, so that

after consolidation Wells Fargo was proposing to make a loan with a 38% increase over the value of Hughes's prior mortgage debt. Id. ¶ 36. Hughes was to pay $1,604.18 per month for this loan, when his previous monthly payment to Chase Manhattan was $815 per month. Id. ¶¶ 11, 42. This payment amounted to approximately 46% of Hughes's monthly income of $3,511.83. Id. ¶ 38. Hughes reported this income to Wells Fargo and made no representations about whether it would increase or decrease in the future. Id. The application that Wells Fargo prepared for his loan indicates that Mr. Hughes had monthly income of $3,783.33 per month. Id. ¶ 37.

Wells Fargo reserved the right to increase the loan's initial interest rate of 7.875% up to a limit of 13.875% after the first two years of the loan. Id. ¶ 41. Wells Fargo's representative told Hughes that "he did not need to worry about the loan being an adjustable-rate mortgage, because he should be able to refinance the loan before the rate changed," which Hughes has not been able to do. Id. ¶ 43-44. Hughes accepted these terms and closed the loan on September 22, 2006. Id. ¶ 40. Hughes paid $10,127.32 in closing costs and received $61,080.22 under the loan. Id. ¶¶ 36, 46.

Hughes brought the present action on January 15, 2009 in the Superior Court of the District of Columbia. Wells Fargo removed the case to this Court on January 29, 2009. Hughes asserts the following claims against Abell, Baltimore, and Modern Management: violations of CPPA (Count I), creation of an equitable mortgage (Count II), violations of TILA and HOEPA (Count III), common law fraud (Count IV), and usury (Count VIII). Id. ¶¶ 50–79, 95-98. Against Wells Fargo, Hughes also alleges violations of CPPA (Count V) and common law negligence (Count VII). Id. ¶¶ 80–84, 90-94. Count VI seeks to quiet title against both Wells Fargo and Abell. Id. ¶¶ 85–89.

4

Defendant Abell has filed a motion for partial summary judgment as well as a motion to dismiss. However, the motion to dismiss includes a standard of review that sets forth the standard for a summary judgment motion and includes a "statement of material facts not in dispute." The Court will treat both of Abell's motions as motions for summary judgment. Wells Fargo has filed a motion to dismiss Hughes's first amended complaint. These motions are fully briefed and ripe for resolution.

## LEGAL STANDARD

### A. Motion to Dismiss

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555-56; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); Atherton v. District of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009). A complaint is plausible on its face "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. This amounts to a "two-pronged approach" under which a court first identifies the factual allegations entitled to an assumption of truth and then determines "whether they plausibly give rise to an entitlement to relief." Id. at 1950-51.

The notice pleading rules are not meant to impose a great burden on a plaintiff. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002). When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. Leatherman v. Tarrant Cnty. Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979); see also Erickson, 551 U.S. at 94 (citing Twombly, 550 U.S. at 555-56). The plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nor does the court accept "a legal conclusion couched as a factual allegation," or "naked assertions [of unlawful misconduct] devoid of further factual enhancement." Iqbal, 129 S. Ct. at 1949-50 (internal quotation marks omitted); see also Aktieselskabet AF 21. November 21 v. Fame Jeans Inc., 525 F.3d 8, 17 n.4 (D.C. Cir. 2008) (explaining that the court has "never accepted legal conclusions cast in the form of factual allegations").

B.  Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(2); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

<u>**ANALYSIS**</u>

**I.**     **Claims Against Wells Fargo**

Hughes alleges three counts against Wells Fargo.  First, he alleges that Wells Fargo violated CPPA by providing him financing on unconscionable terms and misrepresenting material facts about the transaction.  Second, he asserts a common law negligence claim for failing to confirm that Hughes possessed title to his property and providing a loan with unfavorable terms.  Finally, Hughes seeks to quiet title to his primary residence after refinancing his mortgage.

Wells Fargo again moves to dismiss all claims for failure to state a claim.  Alternatively, Wells Fargo moves to dismiss all claims asserted by plaintiff against Wells Fargo under the doctrine of unclean hands.  <u>See</u> Wells Fargo's Mot. to Dismiss [Docket Entry 57] at 5-6. Wells Fargo contends that Hughes has "unclean hands" because he knew that he had signed away his deed prior to refinancing his home with Wells Fargo, and he concealed this fact from Wells Fargo.  <u>Id.</u>  Essentially, Wells Fargo's argument is that even though Hughes alleges that he did not know that he had already transferred title to his home at the time that he refinanced with Wells Fargo, this allegation is false.

**A.  Count V -- CPPA**

Hughes asserts that Wells Fargo's financing practices are unconscionable within the meaning of D.C. Code § 28-3904(r).  Am. Compl. ¶¶ 80–83.  The CPPA applies to real estate finance transactions like the one in this case.  <u>DeBerry v. First Gov't Mortgage & Investors Corp.</u>, 743 A.2d 699, 703 (D.C. 1999).  Whether a practice is unconscionable under this provision is determined by weighing several factors, including "knowledge by the person at the time credit

8

sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer," "knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased," and "that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests."  D.C. Code § 28-3904(r)(1), (2), (5).

Hughes supports his claim that Wells Fargo provided him financing on which "there was no reasonable probability of payment in full," id. § 28-3904(r)(1), with allegations that the financing requires payment of an excessive share of his income.  Hughes alleges that his monthly payment to Wells Fargo amounts to approximately 46% of his monthly income.  Am. Compl. ¶ 38.  He further alleges that although the current interest rate is the minimum allowed by Wells Fargo's terms, that rate may increase in the future.  Id. ¶ 42.  Because Hughes made no representation about whether his present income would remain constant or increase, that -- coupled with the adjustable rate -- could result in future monthly payments of more than half of his income.  Id. ¶ 37.

Hughes's claim, as alleged, is analogous to other CPPA claims that have been sustained in this Circuit.  In Williams v. First Government Mortgage & Investors Corp., 225 F.3d 738 (D.C. Cir. 2000), the D.C. Circuit upheld a jury verdict finding that the defendant had knowledge that there was no reasonable probability of payment on a refinanced mortgage requiring 57% of the plaintiff's monthly income.  Id. at 744.  Similarly, in Johnson v. Long Beach Mortgage Loan Trust 2001-4, 451 F. Supp. 2d 16 (D.D.C. 2006), the court declined to dismiss a complaint under section 28-3904(r)(1) alleging that loan payments would require more than half of the plaintiff's income.  Id. at 38.  Here, Hughes similarly alleges that Wells Fargo's terms require payment of

nearly half of his income, or even more, given potential increases in the rate in the future. Hughes has satisfied his pleading burden, then, because he has alleged that Wells Fargo was aware that its terms would require approximately half of his income and that he had no prospects for increased income.

Hughes next alleges that Wells Fargo's terms are unconscionable under D.C. Code § 28-3904(r)(2) because Wells Fargo knew that he would be unable "to receive substantial benefits" from Wells Fargo's terms. Through the refinancing, Hughes received $61,080.22 upon closing and consolidated $33,517.03 in other debt. Am. Compl. ¶¶ 35, 36. Notwithstanding these apparent benefits, Hughes contends that the refinancing also doubled his monthly mortgage payment and paid off debt on which the statute of limitations had run. Id. ¶¶ 35, 42. Because section 28-3904(r)(2) is merely a factor for the Court to consider in addressing whether there was an unconscionable practice, rather than an independent basis for recovery, the Court need not determine whether Hughes has sufficiently pled that Wells Fargo provided no "substantial benefit." Nonetheless, Hughes has at least called into question whether the benefit of Wells Fargo's payment and debt consolidation was "substantial" in light of the increase in Hughes's monthly payment.

Finally, Hughes alleges that Wells Fargo has "knowingly taken advantage of the inability of the consumer reasonably to protect his interests." D.C. Code § 28-3904(r)(5). In support of this factor, Hughes asserts that a representative from a settlement company retained by Wells Fargo had Hughes "sign a stack of papers" but only gave Hughes "unsigned copies" and that "no notary was present." Am. Compl. ¶ 40. This alleged lack of formal procedures to close the loan may be a poor business practice, but alone does not suggest Hughes's inability to understand

Wells Fargo's terms.  See Williams, 225 F.3d at 744–45 (holding that a retiree with a sixth grade education who was given little time to review the terms had stated a claim); Johnson, 451 F. Supp. 2d at 38 (holding that allegations of limited education and business sophistication were sufficient to state a claim).  Even under the liberal pleading standard of the Federal Rules, the lack of a notary or formal procedures does not amount to an inability to protect one's interests.  But again, this is only a factor is addressing unconscionability, not an independent claim.

Considering together these three factors of section 28-3904(r), Hughes has stated a claim of unconscionability under the CPPA.  All that is required at this stage of the litigation is that Hughes's complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 129 S. Ct. at 1949 (internal quotation marks omitted).  The five factors by which the CPPA defines unconscionability are disjunctive and non-exhaustive.  At a minimum, Hughes sufficiently alleges that, under the first factor, "there was no reasonable probability of payment in full."  Therefore, the Court will allow Hughes's unconscionability claim to proceed.

Hughes alleges a second violation of the CPPA under D.C. Code § 28-3904(e), claiming that Wells Fargo "misrepresent[ed] material facts when such failure tended to mislead."  Am. Compl. ¶ 84.  He asserts that a Wells Fargo representative told him not to worry about the loan being an adjustable rate mortgage, because he should be able to refinance the loan before the rate changed in two years. Id. ¶ 43.  Hughes has not been able to refinance the Wells Fargo loan.  Id. ¶ 44. Wells Fargo's alleged representation that he "need not worry" about the adjustable rate mortgage because he "should be able to refinance" the loan may have misled Hughes regarding the potential costs and risks involved in his transaction with Wells Fargo.  Hughes's ability to

refinance would potentially prevent an interest rate increase up to 13.875%, which would substantially increase his total payments under the loan. Am. Compl. ¶ 42. Under the liberal pleading standard of the Federal Rules, Hughes has also stated a CPPA claim for misrepresentation under D.C. Code § 28-3904(e).

**B. Count VI -- Quiet Title**

Hughes seeks to quiet title against Wells Fargo on the ground that Wells Fargo obtained its security interest in the Property through unconscionable terms. Am. Compl. ¶ 84. The quiet title count depends upon the outcome of the CPPA count. Civil remedies available under the CPPA include "any [] relief which the court deems proper," which may include rescission. D.C. Code § 28-3905(k)(1)(F). In addition, the Court's equitable powers allow it to quiet title in Hughes if Wells Fargo's actions warrant that remedy. Hence, it would be premature to dismiss Hughes's quiet title count while his unconscionability claim remains pending. See, e.g., Armenian Genocide Museum and Mem'l, Inc. v. Cafesjian Family Found., Inc., 595 F. Supp. 2d 110, 119 (D.D.C. 2009) ("[I]t is premature to consider dismissal of [a quiet title count], which may or may not constitute an appropriate remedy depending on the evidence yet to be adduced in this case.")

**C. Count VII -- Negligence**

Wells Fargo moves to dismiss Hughes' common law negligence claim. To establish a cause of action in negligence, plaintiff "must prove that defendant owed [him] a duty of care, breached that duty, actually and proximately harmed [him] by breaching that duty, and damages." High v. McLean Fin. Corp., 659 F. Supp. 1561, 1570 (D.D.C. 1987) (citing District of Columbia v. Fowler, 497 A.2d 456 (D.C. 1985)).

12

Wells Fargo argues that it does not owe Hughes a duty of care, asserting that an arms-length business transaction does not give rise to an agency relationship or fiduciary duty. See Urban Investment, Inc. v. Branham, 464 A.2d 93, 96 (D.C. 1983). But mortgage lenders may owe a duty of care to borrowers. High, 659 F. Supp. at 1570. In High, plaintiffs asserted a claim for negligence against a lender who assured plaintiffs that there were "no problems" with their mortgage application; however, another lending institution ultimately denied the application. Id. The court held that plaintiffs had stated a cause of action for negligence because "the defendant bank owed a duty to process a loan application with reasonable care when it had guaranteed the interest rate and the applicant had paid a loan processing fee." Id.

Hughes alleges that he paid $10,127.32 in closing costs to obtain the loan from Wells Fargo. Am. Compl. ¶ 46. Further, he alleges that Wells Fargo misstated his monthly income in the loan, provided a loan for which he would be paying over 50% of his gross monthly income, and mistakenly assured him that he "did not need to worry" about the loan being an adjustable rate mortgage because he "should be able to refinance the loan." Id. ¶¶ 37, 38, 43. The loan doubled his monthly mortgage payments and converted unsecured debt into a debt secured against his home. Id. ¶ 42. On this basis, Hughes has sufficiently alleged that Wells Fargo owed him a duty of care, breached that duty, and caused him actual and proximate harm and damages. Thus, he has stated a cause of action for negligence.

### D. Unclean Hands

The scope of a court's review on a motion to dismiss is limited to the allegations of the complaint. Wells Fargo relies on two documents that were not attached to Hughes's complaint in contending that Hughes knew he transferred his deed prior to his refinancing with Wells Fargo.

See Wells Fargo's Mot. to Dismiss at 5-6.  These documents are an "Agreement to Sell Real

Estate," which bears Hughes's signature, and a handwritten statement by Hughes that states "I

sold my home."  Id.  The parties do not dispute the authenticity of these documents.  Id.  Wells

Fargo urges the Court to consider these documents in its motion to dismiss, arguing that where

the complaint references or relies on documents that are integral to the plaintiff's complaint, the

Court may consider these documents in its review.  See Kaempe v. Myers, 367 F.3d 958, 965

(D.C. Cir. 2004).

The Court need not consider these documents to reach a decision.  Hughes alleges that

defendants Baltimore, Abell, and Modern Management unwittingly defrauded him out of the title

to his home.  Am. Comp.  ¶¶ 17, 20, 47.  Hughes admits that he signed papers, but contends that

Baltimore, Abell, and Modern Management fraudulently concealed the true nature of the

transaction, which he believed was a loan.  Id.  Wells Fargo argues that an individual's signature

presumes knowledge of the contents of an agreement.  Wells Fargo's Mot. to Dismiss at 5. True

enough, but fraud is a well-established exception to that basic contract rule.

Wells Fargo relies on several cases that do not advance its unclean hands defense.  For

example, Wells Fargo cites to Assassination Archives & Research Ctr. v. CIA, 48 F. Supp. 2d 1,

14 (D.D.C. 1999), for the assertion that the "doctrine of unclean hands does not stand for the

proposition that two wrongs make a right." In Assassination Archives,  the plaintiff claimed that

he only retained information from the CIA -- in violation of his contract -- because the

information related to unredressed misconduct at the CIA.  Id.  The court ruled that an unclean

hands defense did not excuse the plaintiff's own unlawful taking.  Id.  Here, Hughes alleges that

the terms of the loan he received from Wells Fargo were unconscionable.  Am. Comp.  ¶¶ 37, 38,

41, 42.   Indeed, even if Hughes misrepresented his transaction with Baltimore to Wells Fargo, that may not excuse Wells Fargo's alleged unconscionable behavior.

Furthermore, the defense of unclean hands does not fit comfortably with alleged violations of CPPA, which is a broad remedial statute intended to "assure that a just mechanism exists to remedy *all* improper trade practices." DeBarry v. First Gov't Mortgage & Investors Corp., 743 A.2d 699, 700 (D.C. 1999).  Hughes alleges that he was unwittingly defrauded out of the title of his home; if his allegations are taken to be true, he was not aware that he had transferred title to his home.  Am. Comp.  ¶¶ 17, 20, 21, 47. Given the broad remedial intent of CPPA, and Hughes's allegations of fraud, Wells Fargo's unclean hands defense must fail.

## II.    Claims Against Abell

Hughes asserts six claims against Abell:  violations of CPPA (Count I), creation of an equitable mortgage (Count II), violations of TILA and HOEPA (Count III), common law fraud (Count IV), quiet title (Count VI), and usury (Count VIII).  Abell moves to dismiss all claims under the doctrine of unclean hands and to dismiss Counts I, III, IV, and VIII under the relevant statute of limitations. As discussed above, the Court will treat Abell's motions as motions for summary judgment.

### A.  Unclean Hands

Abell's unclean hands defense is without merit.  Unclean hands is a defense available "where the plaintiff's misconduct occurred in connection with the same transaction that is the subject of her claim."  Zander v. Reid, 980 A.2d 1096, 1101 (D.C. 2009).  For example, in International Tours & Travel, Inc. v. Khalil, 491 A.2d 1149, 1155 (D.C. 1985), the plaintiff, defendant's former employer, participated in a deceptive scheme with defendant to obtain

customers.  The district court ruled that plaintiff's participation in the scheme barred plaintiff's recovery -- under the doctrine of unclean hands -- for defendant's later misappropriation of company funds.  Id.  The D.C. Circuit reversed, ruling that the district court failed to identify the "factual basis for determining that the entire sum owed by [defendant] was causally related to unclean hands on the part of [plaintiff]."  Id.  In other words, plaintiff's misdeeds did not excuse defendant's unrelated unlawful behavior.

Here, Abell asserts that Hughes knew or should have known that he was transferring title to Abell in September 2004 and thus any facts that Hughes alleges to the contrary are false.  Notably, Abell does not allege any misconduct by Hughes as to the loan transaction at issue, just that Hughes was aware of his actions.  See Abell's Mot. to Dismiss [Docket Entry 82] at 12-14.  Instead, it appears that Abell bases his unclean hands defense on Hughes bringing the current lawsuit and alleging that he was not aware that title transferred to Abell.  This is not an appropriate application of the unclean hands doctrine, and hence Abell's unclean hands defense must fail.

## B.  Statute of Limitations

### i. Counts I and IV

Abell raises the statute of limitations as a defense to Counts I, III, IV, and VIII.  The same analysis applies to Count I, violation of CPPA, and Count IV, fraud.  The limitations period for bringing an action for a violation of CPPA or for common law fraud is three years.  D.C. Code § 12-301(8) (2010).  Hughes brought this action on January 15, 2009.  Abell argues that Hughes's alleged injury -- transferring title to his home -- occurred in September or October 2004, more than three years before suit was brought.

The three-year limitations period, however, accrues from the actual injury or the discovery of the injury. <u>Morton v. National Med. Enters.</u>, 725 A.2d 462, 468 (D.C. 1999). The "discovery rule" applies where the alleged tortious conduct obscures when the injury occurs. <u>Id.</u> Under the discovery rule, a cause of action accrues "when one knows or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." <u>Id.</u>; <u>Williams v. Central Money Co.</u>, 974 F. Supp. 22, 26 (D.D.C. 1997). District of Columbia courts recognize that "when one person defrauds another, there will be a delay between the time the fraud is perpetrated and the time the victim awakens to the fact." <u>Valentine v. Elliott (In re Estate of Delaney)</u>, 819 A.2d 968, 981 (D.C. 2003). "What constitutes the accrual of a cause of action is a question of law. When accrual actually occurred in a particular case is a question of fact." <u>Diamond v. Davis</u>, 680 A.2d 364, 370 (D.C. 1996) (citations omitted). The court must engage in a fact-specific inquiry to evaluate a party's "reasonable diligence" in pursuing evidence of wrongdoing. <u>Id.</u> at 370-71.

Abell asserts that Hughes knew or should have known that he had transferred title to his home when he signed the relevant legal documents and drafted a handwritten statement of understanding in September 2004. Abell's Mot. to Dismiss at 8. Hughes contends, however, that fraudulent concealment of material terms of his "loan" transaction by Abell and Baltimore, including the critical information that he had transferred title to his property, prevented Hughes from discovering the injury until he attempted to sell his home in September 2008. Hughes's Mem. in Opp. to Abell's Mot. to Dismiss [Docket Entry 87] at 9. Hughes alleges that Baltimore represented that he and Modern Management "could loan Mr. Hughes money." Am. Compl. ¶ 17. But, after signing a number of papers, at the end of the transaction Baltimore gave Hughes only a

lease agreement.  Id. ¶ 21.  Hughes alleges that he repeatedly attempted to contact Modern

Management to obtain copies of the signed documents, but to no avail. Id. ¶ 22.  Furthermore,

Abell did not record the deed transferring title until September 15, 2006, id. ¶ 47, which Hughes

alleges prevented him from discovering the true nature of the 2004 transaction.

The movant for summary judgment must demonstrate the absence of material disputed

facts and the right to judgment as a matter of law.  Here, numerous factual disputes exist as to

what Baltimore and Abell, on behalf of Modern Management, represented to Hughes during and

following the 2004 financial transaction.  The disputed facts relate to allegations of fraudulent

concealment and obstructive behavior on the part of defendants Baltimore, Abell, and Modern

Management.  Because these disputed facts obscure when Hughes's causes of action under CPPA

and for fraud began to accrue, Counts I and IV will not be dismissed as barred by the statute of

limitations at this juncture.

### ii.  Count III:  TILA and HOEPA

Hughes alleges that Baltimore, Abell, and Modern Management violated the Truth in

Lending Act ("TILA"), 15 U.S.C. 1601, et. seq.,  and the Home Ownership and Equity Protection

Act ("HOEPA"), 15 U.S.C. §§ 1602(aa), 1639.  Together, TILA and HOEPA "give[] consumers

the right to cancel certain credit transactions that involve a lien on a consumer's principal

dwelling," and "prohibit[] certain acts or practices in connection with credit secured by a

consumer's principal dwelling." 12 C.F.R. § 226.1(b) (2010).  Specific statutory provisions

require that creditors reveal essential credit terms and apprise consumers of certain terms and

conditions of their loans.

Hughes alleges that the transaction he entered with Baltimore, Abell, and Modern

Management in September 2004 was a "sham sale of his home" that should qualify "as a consumer credit transaction within the meaning of [TILA]." Am. Compl. ¶ 60. The statute of limitations has, however, expired on Hughes's TILA and HOEPA claims. Under 15 U.S.C. § 1640(e), an action pursuant to TILA or HOEPA must be commenced "within one year from the date of the occurrence of the violation."

But that is not the end of the analysis. "Courts may allow equitable tolling of a statute of limitations where a claimant has received inadequate notice." Freeman v. FDIC, 56 F.3d 1394, 1405 n.2 (D.C. Cir. 1995) (internal citations omitted); United States v. BCCI Holdings (Lux.), S.A., 916 F. Supp. 1276, 1284 (D.D.C. 1996) ("[T]he doctrine of equitable tolling is available to a court to soften the harsh result that would obtain from the strict application of a statute of limitations."). Setting aside cases against the sovereign, the Supreme Court has observed that the doctrine of equitable tolling "is read into every federal statute of limitation." Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946).

If a statute of limitations period is jurisdictional, however, it is not subject to equitable tolling. Hardin v. City Title & Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986). In Hardin, the court ruled that the statute of limitations in the Real Estate Settlement Procedures Act (RESPA) was a jurisdictional requirement and thus "not subject to equitable tolling under the doctrine of fraudulent concealment." Id. The court reached this conclusion by analyzing how the statute of limitations was contained in the same sentence that created federal and state court jurisdiction -- the subtitle of that section was "JURISDICTION OF THE COURTS" -- and observing that the legislative history did not contain any contradictory intent. Id. The Hardin court deemed it "reasonable to conclude that Congress intended thereby to create a jurisdictional

19

time limitation." Id. The Hardin court also noted, in dictum, that the limitations period under

TILA, which is identical to that of RESPA, is jurisdictional. Id.; Griffith v. Barnes, 560 F. Supp.

2d 29, 36-37 (D.D.C. 2008) (dismissing untimely claim for damages under TILA *sua sponte*

because statute of limitations was jurisdictional).

But Hardin was decided before the Supreme Court's decision in Arbaugh v. Y & H Corp.,

546 U.S. 500, 511 (2006). There, the Supreme Court cautioned against using as precedent

"drive-by jurisdictional rulings," id., that dismiss claims "'for lack of jurisdiction' when some

threshold fact has not been established, without explicitly considering whether the dismissal

should be for lack of subject matter jurisdiction or for failure to state a claim," id. (quoting Da

Silva v. Kinsho Int'l Corp., 229 F.3d 358, 361 (2d Cir. 2000)).

Arbaugh adopted a "clear statement" rule for determining whether a statutory prerequisite

to suit is jurisdictional:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall
> count as jurisdictional, then courts and litigants will be duly instructed and will
> not be left to wrestle with the issue. But when Congress does not rank a statutory
> limitation on coverage as jurisdictional, courts should treat the restriction as
> nonjurisdictional in character.

Id. at 515-16 (citation omitted).[1] Applying that "clear statement" rule here, this Court concludes

that the statute of limitations for TILA and HOEPA claims is not jurisdictional.[2] Thus, TILA and

---

[1] The D.C. Circuit has recently reiterated that "direct statutory language" is necessary to hold a statutory requirement jurisdictional in the context of exhaustion of administrative remedies. Blackmon-Malloy v. U.S. Capitol Police Bd., 575 F.3d 699, 705 (D.C. Cir. 2009) ("To make compliance with a statutory provision a prerequisite to federal jurisdiction, a statute must include 'direct statutory language indicating that there is no federal jurisdiction prior to [such compliance].'") (quoting Avocados Plus, Inc. v. Veneman, 370 F.3d 1243, 1248 (D.C. Cir. 2004)) (brackets in original).

[2] Other circuits have also held that the statute of limitations is not jurisdictional, and thus is subject to equitable tolling. See, e.g., Ellis v. Gen. Motors Acceptance Corp., 160 F.3d 703, 706 (11th Cir.1998).

HOEPA claims may be subject to equitable tolling.

Hughes alleges that Abell and Baltimore's fraudulent concealment of material terms of his "loan" transaction, including the critical information that he had transferred title to his property, prevented Hughes from pursuing this action in a timely manner. He alleges that Baltimore represented to him that he and Modern Management "could help him save his home and allow him to remain in the home," and that "he and his partner were in the business of helping people in trouble and could loan Mr. Hughes money." Am. Compl. ¶ 17. After signing a number of papers, at the end of the transaction Baltimore allegedly gave Hughes only a lease agreement. Id. ¶ 21. Hughes contends that he did not know that he had signed away title to his home, or that Abell recorded a deed transferring title on September 15, 2006. Id. ¶ 47. In combination, these alleged facts are adequate to preserve Hughes's claims under TILA and HOEPA under the doctrine of equitable tolling. Hence, those claims will not be dismissed as barred by the statute of limitations at this time.

### iii. Count VIII

The District of Columbia prohibits certain loans that exceed interest rates of 24%. See D.C. Code § 12-3304. The limitations period for a cause of action for usury is one year. Id. Unlike Hughes's claims for violation of CPPA and fraud, application of the "discovery rule" is not appropriate for the usury claim. Hughes alleges that, in September and October 2004, he believed he was obtaining a loan that paid off his mortgage arrears of approximately $20,000 and provided him with an additional $10,000.00. Am. Compl. ¶ 23. He also knew the amount of his monthly payments would be $1034.76 and he was aware of the required final payment of $75,000.00. Id. Hughes was thereby aware of all of the facts underlying the claim of usury in

2004, yet he did not bring this action until 2009. Thus, his claim for usury is barred by the statute of limitations and will be dismissed.

## CONCLUSION

Hughes alleges facts sufficient to state a claim for negligence (Count VII) and claims for unconscionability and misrepresentation under the CPPA (Count V). Hughes's quiet title count (Count VI) therefore also survives. For these reasons, Wells Fargo's motion to dismiss will be denied. Vincent Abell's motions for summary judgment will be granted as to the claim for usury (Count VIII) but denied as to all other claims (Counts I, II, III, IV, VI). A separate Order accompanies this Memorandum Opinion.

_____/s/_____

JOHN D. BATES

United States District Judge

Dated:    November 16, 2010