**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **GEORGE R. HUGHES,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  09-0220 (JDB)** |
| **VINCENT ABELL, et al.,** | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff George R. Hughes brings this action against Vincent Abell, Calvin Baltimore, Modern Management Company, and Wells Fargo Bank.  His claims relate to two transactions involving Hughes' residence, a property in Washington, DC, which Hughes purchased in 1997. In 2004, Hughes transferred title to the property to Abell in a transaction also involving Baltimore and Modern Management.  Then, in 2006, Hughes nonetheless entered into a mortgage transaction with Wells Fargo, not disclosing to Wells Fargo that he had previously transferred title to the property.

With respect to Abell, Baltimore, and Modern Management, Hughes brings claims for violations of the D.C. Consumer Protection Procedures Act ("CPPA"), the Truth in Lending Act ("TILA") and the Home Ownership and Equity Protection Act ("HOEPA"), a claim for common law fraud, and a claim for an equitable mortgage.  With respect to Wells Fargo, Hughes alleges violations of the CPPA.  Hughes maintains that he is the rightful owner of the residence and he seeks to quiet title with respect to both Abell and Wells Fargo.  Wells Fargo asserts counterclaims against Hughes for equitable subrogation, equitable lien, unjust enrichment, fraud,

and breach of contract, and against Abell for fraud, quiet title, equitable subrogation, and unjust enrichment.  Abell asserts a crossclaim for quiet title against Wells Fargo.

Now before the Court are Wells Fargo's motion for summary judgment on its claims against the other parties and Abell's renewed motion for summary judgment on Hughes' claims against Abell and Modern Management.  Although the numerous claims in this case belie easy description, Wells Fargo's primary contention is that the evidence in the record shows that Hughes was aware that Abell claimed ownership of the residence at the time that Hughes entered into the transaction with Wells Fargo.  Wells Fargo argues that Hughes' knowledge should bar any recovery against Wells Fargo and also warrants judgment in Wells Fargo's favor on its claims.  Abell, for his part, moves out of disagreement with this Court's prior decision rejecting his argument that Hughes' claims are barred by the statute of limitations.

For the reasons discussed below, the Court will grant Wells Fargo's motion in part and deny it in part.  As described below, the Court has reached two primary conclusions at this stage of the proceedings.  With respect to Wells Fargo's claims, the Court concludes that Hughes committed fraud against Wells Fargo.  Nonetheless, the Court rejects Wells Fargo's assertion that Hughes' conduct bars his recovery under the CPPA.  This claim will be permitted to proceed, but in more limited form than as alleged by Hughes' complaint.

There are many other issues in this case, some of which can also be resolved now based on the fraud determination.  Others are also largely decided by the fraud decision, but technically cannot be resolved until the resolution of the CPPA claim or the resolution of the dispute between Hughes and Abell about the prior transaction.  Many of these issues will nonetheless fall easily into place once the other claims in the case are resolved.

Accordingly, the Court will grant Wells Fargo's motion with respect to the fraud claim, as well as with respect to some, but not all, of Wells Fargo's other claims. For the reasons discussed below, the Court will also deny Abell's motion.

I. Background

a. Facts

Hughes purchased 5236 5th Street, NW, Washington, DC ("the Property") in November 1997. Am. Compl. [Docket Entry 53] ¶¶ 4, 9. He took out two mortgages against the Property in order to pay for it, the larger of the two from Chase Manhattan Bank. Id. ¶¶ 10, 12. After Hughes became delinquent on the larger loan in 2004, Chase Manhattan notified him that it would foreclose. Id. ¶¶ 13, 14. Hughes needed to pay arrears in the amount of $16,485.51, plus costs and fees, to prevent the auction of his home in September 2004. Id. ¶ 4. Prior to foreclosure, Calvin Baltimore, working with Abell and Modern Management, solicited Hughes's business and represented that he would help Hughes remain in his home. Id. ¶¶ 15–17, 24. Hughes signed a series of documents, the effect of which was to transfer title to the property to Abell, who then rented it back to Hughes. Id. ¶¶ 20, 25. Hughes alleges that he understood the transaction "as a way to retain ownership of his home." Id. ¶ 24.

The only papers Baltimore provided Hughes at the end of the transaction were a lease agreement and an option agreement. Id. ¶ 21. Baltimore told Hughes that he would provide him with copies of the other papers, but never did, despite Hughes's repeated attempts to contact Baltimore and obtain copies. Id. The lease agreement provided that Hughes would pay $1034.76 per month, which Hughes alleges that he believed would "cover his mortgage as well as the loan." Id. ¶ 20. Attached to the lease was an "Option Agreement" that provided that Hughes could purchase his home for $75,000.00 within the next year. Id. ¶ 22. Baltimore

explained that Modern Management would help Hughes refinance the loan at the end of the year. Id. ¶ 20. Hughes also received $10,000.00 up front as part of this transaction.  Id.  Assuming Hughes borrowed $30,000 under this loan — the $10,000 payment and approximately $20,000 to cover arrears — the annual percentage rate would have been 122.57%, based on twelve monthly payments of $1034.76 and a final payment of $75,000.  Id. ¶ 23. At the time of this transaction in September 2004, the property was worth $147,060, according to D.C. property tax assessment records.  Id. ¶ 24.

Around August 2006, Hughes received notice from Chase Manhattan that it had changed his contact information to that of the offices of Modern Management.  Id. ¶ 29.  He also received notice from Modern Management that he was behind in his payments.  Id. ¶ 30.  Hughes approached defendant Wells Fargo to seek refinancing of his Chase Manhattan mortgage.  Id. ¶¶ 31, 32.  With respect to his transaction with Abell, Hughes told Wells Fargo, orally and in writing, "that he had previously borrowed money (from Calvin Baltimore) to stop a foreclosure against the Property."  Id. ¶ 34. Wells Fargo tried unsuccessfully to reach Baltimore and did not find any recordation of Hughes' transaction with Abell upon inquiring at the Recorder of Deeds. Id.  Wells Fargo suggested to Hughes that he discuss his transaction with Baltimore with a lawyer, and Hughes spoke with the law firm of Weinstock, Friedman, and Friedman, P.A.  See Decl. of George Hughes [Docket Entry 115-2] ¶¶ 18, 21-22.

Wells Fargo offered to refinance Hughes' Chase Manhattan mortgage so long as Hughes consolidated his second mortgage and other nonmortgage debts, which together totaled $33,517.03, into his agreement with Wells Fargo.  Id. ¶¶ 33, 36.  Hughes would also receive $61,080.22 up front at closing.  Id. ¶ 36.  The statute of limitations had passed for some of these nonmortgage debts.  Id. ¶ 35.  Hughes's outstanding balance on his Chase Manhattan mortgage

was $87,775.43, so that after consolidation Wells Fargo was proposing to make a loan with a 38% increase over the value of Hughes's prior mortgage debt.  Id. ¶ 36.  Hughes was to pay $1,604.18 per month for this loan; his previous monthly payment to Chase Manhattan was $815 per month.  Id. ¶¶ 11, 42.  This payment amounted to approximately 46% of Hughes's monthly income of $3,511.83.  Id. ¶ 38.  Hughes reported this income to Wells Fargo and made no representations about whether it would increase or decrease in the future.  Id.  The application that Wells Fargo prepared for his loan indicates that Hughes had monthly income of $3,783.33 per month.  Id. ¶ 37.

Wells Fargo reserved the right to increase the loan's initial interest rate of 7.875% up to a limit of 13.875% after the first two years of the loan.  Id. ¶ 41.  Wells Fargo's representative told Hughes that "he did not need to worry about the loan being an adjustable-rate mortgage, because he should be able to refinance the loan before the rate changed," which Hughes has not been able to do.  Id. ¶ 43-44. Hughes accepted these terms and closed the loan on September 22, 2006.  Id. ¶ 40.  Hughes paid $10,127.32 in closing costs.  Id. ¶ 46.   Prior to the commencement of the transaction between Hughes and Wells Fargo on September 22, and unbeknownst to either party, on September 15, 2006, Abell recorded a deed transferring title of the property from Hughes to Abell.  Id. ¶ 47.

b.  Present Suit

Hughes brought the present action on January 15, 2009 in the Superior Court of the District of Columbia.  Wells Fargo removed the case to this Court on January 29, 2009.  Hughes asserts the following claims against Abell, Baltimore, and Modern Management:  violations of the CPPA (Count I), creation of an equitable mortgage (Count II), violations of TILA and HOEPA (Count III), common law fraud (Count IV), and usury (Count VIII).  Am. Compl.  ¶¶

50–79, 95-98.  Against Wells Fargo, Hughes asserts violations of the CPPA (Count V) and

common law negligence (Count VII).  Id.  ¶¶ 80–84, 90-94.  Count VI seeks to quiet title against

both Wells Fargo and Abell.  Id. ¶¶ 85–89.  Abell filed counterclaims against Hughes for quiet

title, rent or possession, unjust enrichment, and fraud.  Countercl. [Docket Entry 70] ¶¶ 43-69.

Abell also filed a crossclaim to quiet title against Wells Fargo.  Cross-cl. [Docket Entry 70]

("Abell Cross-cl. Against Wells Fargo") ¶¶ 74-75.  Wells Fargo filed crossclaims against Abell

for fraud (Count I), quiet title (Count II), equitable subrogation (Count III), and unjust

enrichment (Count IV).  Cross-cl. [Docket Entry 12] ("Wells Fargo Cross-cls. Against Abell") ¶¶

6-33.  Wells Fargo also asserts the following counterclaims against Hughes:  equitable

subrogation (Count I), equitable lien (Count II), unjust enrichment (Count III), fraud (Count IV),

and breach of contract (Count V).  Wells Fargo Bank, N.A.'s Am. Answer and Countercls. to Pl.

George R. Hughes' Compl. [Docket Entry 30] ("Wells Fargo Countercls. Against Hughes").

        This Court previously ruled, in July 2009, on Wells Fargo's motion to dismiss Hughes's

original complaint.  Hughes v. Abell, 634 F. Supp. 2d 110 (D.D.C. 2009).  The Court ruled that

Hughes had alleged facts sufficient to state an unconscionability claim under the CPPA, and that

Hughes's quiet title count also survived.  Wells Fargo's motion to dismiss was, however, granted

in part, because Hughes failed adequately to allege misrepresentation under the CPPA.  Wells

Fargo then filed an answer to Hughes' complaint and then an amended answer, which contained

Wells Fargo's counterclaims against Hughes.  Hughes was granted leave to file an amended

complaint with restated allegations of misrepresentations under the CPPA in May 2010.  Wells

Fargo filed a motion to dismiss this amended complaint and Abell filed a motion for summary

judgment on some, but not all, of the claims against him.  After the filing of these motions and

during the course of ongoing discovery, the Court was informed of a privilege dispute arising

from a subpoena directed to the Weinstock firm by Wells Fargo. After considering argument from the parties and reviewing relevant documents in camera, the Court ruled that the content of communications between Hughes and staff of the law firm was protected by the attorney-client privilege.

In November 2010, the Court ruled on Wells Fargo's motion to dismiss and Abell's motion for summary judgment. Hughes v. Abell, 794 F. Supp. 2d 1 (D.D.C. 2010). The Court denied Wells Fargo's motion in its entirety, granted Abell's motion with respect to the usury claim, and denied Abell's motion with respect to the remaining claims. Id. at 15. Wells Fargo then filed an answer to the amended complaint.

Wells Fargo filed the present motion for summary judgment in April 2011. In January 2012, the Court ordered supplemental briefing on whether a declaration by Hughes that was attached to Hughes' opposition to Wells Fargo's motion waived the attorney-client privilege with respect to the content of his communications with the Weinstock firm. A hearing on the motion for summary judgment, as well as the privilege issue, was held on February 24, 2012. The Court then ruled that Hughes' declaration did waive the attorney-client privilege with respect to his communications with the firm in the time period surrounding his transaction with Wells Fargo. The Court subsequently released a partially redacted version of a document produced by the Weinstock firm that had previously been provided to the Court for in camera review. The document, entitled "Redacted Intake Notes Summary," described communications between Hughes and Weinstock firm staff. The Court ordered Wells Fargo to refile its motion for summary judgment with a supplemental memorandum addressing the significance, if any, of the released document. On March 23, 2012, Hughes stipulated to the dismissal of his negligence claim (Count VII) against Wells Fargo. Wells Fargo then refiled its motion for summary

judgment with a supplemental memorandum addressing the significance of the released documents.  On April 20, 2012, Abell filed a renewed motion for summary judgment on all the remaining counts that Hughes alleges against Abell and Modern Management.  The motions are now ripe for decision by the Court.

## II.  Summary Judgment Standard

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(2); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

III.  Discussion

a.  Hughes' Claims Against Wells Fargo

Hughes has two remaining claims against Wells Fargo.  First, he alleges that Wells Fargo

violated the CPPA by providing him financing on unconscionable terms and misrepresenting

material facts about the transaction.  Second, Hughes seeks to quiet title on the Property on the

ground that Wells Fargo obtained its security interest in the Property in violation of the CPPA.

i.  Hughes' Claim Under the CPPA

Hughes asserts that Wells Fargo's financing practices are unconscionable within the

meaning of D.C. Code § 28-3904(r).  Am. Compl. ¶¶ 80–83.  The CPPA applies to real estate

finance transactions like the one in this case.  DeBerry v. First Gov't Mortgage & Investors

Corp., 743 A.2d 699, 703 (D.C. 1999).  Whether a practice is unconscionable under this

provision is determined by weighing several factors, including "knowledge by the person at the

time credit sales are consummated that there was no reasonable probability of payment in full of

the obligation by the consumer," "knowledge by the person at the time of the sale or lease of the

inability of the consumer to receive substantial benefits from the property or services sold or

leased," and "that the person has knowingly taken advantage of the inability of the consumer

reasonably to protect his interests."  D.C. Code § 28-3904(r)(1), (2), (5).

Hughes supports his claim that Wells Fargo provided him financing on which "there was

no reasonable probability of payment in full," id. § 28-3904(r)(1), with allegations that the

financing requires payment of an excessive share of his income.  Hughes alleges that his monthly

payment to Wells Fargo amounts to approximately 46% of his monthly income.  Am. Compl. ¶

38.  He further alleges that although the interest rate at the time was the minimum allowed by

Wells Fargo's terms, that rate may increase in the future.  Id. ¶ 42.  Because Hughes made no

representation about whether his present income would remain constant or increase, that —

coupled with the adjustable rate — could result in future monthly payments of more than half of

his income.  Id. ¶ 37.

Hughes next alleges that Wells Fargo's terms are unconscionable under D.C. Code § 28-

3904(r)(2) because Wells Fargo knew that he would be unable "to receive substantial benefits"

from Wells Fargo's terms.  Through the refinancing, Hughes received $61,080.22 upon closing

and consolidated $33,517.03 in other debt.  Am. Compl. ¶¶ 35, 36.  Notwithstanding these

apparent benefits, Hughes contends that the refinancing also doubled his monthly mortgage

payment and paid off debt on which the statute of limitations had run.  Id. ¶¶ 35, 42.

Finally, Hughes alleges that Wells Fargo has "knowingly taken advantage of the inability

of the consumer reasonably to protect his interests."  D.C. Code § 28-3904(r)(5).  He asserts that

a representative from a settlement company retained by Wells Fargo had Hughes "sign a stack of

papers" but only gave Hughes "unsigned copies" and that "no notary was present."  Am. Compl.

¶ 40.

The Court has previously concluded that, in consideration of these three factors under

section 28-3904(r), Hughes stated a claim of unconscionability under the CPPA.  Hughes, 794 F.

Supp. 2d at 9.  The Court determined that "[a]t minimum, Hughes sufficiently alleges that, under

the first factor, 'there was no reasonable probability of payment in full.'"  Id.

Hughes also alleges a second violation of the CPPA, claiming that Wells Fargo

"misrepresent[ed] material facts when such failure tended to mislead."  Am. Compl. ¶ 84.  The

CPPA prohibits "misrepresent[ations] as to a material fact which has a tendency to mislead."

D.C. Code § 28-3904(e).  Hughes asserts that a Wells Fargo representative told him not to worry

about the loan being an adjustable rate mortgage, because he should be able to refinance the loan

before the rate changed in two years. Am. Compl. ¶ 43.  Hughes alleges that he has not been able

to refinance the Wells Fargo loan.  Id. ¶ 44.  The Court previously concluded that "Wells Fargo's

alleged representation . . . may have misled Hughes regarding the potential costs and risks

involved in his transaction with Wells Fargo."  Hughes, 794 F. Supp. 2d at 9.

ii.  Wells Fargo's Argument for Summary Judgment on CPPA Claim

Wells Fargo argues that, contrary to Hughes' allegations, the terms of the loan are not

unconscionable.  First, Wells Fargo indicates that Hughes' contention that the loan had "an

interest rate that would range between 7.875% and 13.875%," Am. Compl. ¶ 42, is factually

incorrect.  Wells Fargo's Mem. in Supp. of its Mot. for Summ. J. [Docket Entry 132-1] ("Wells

Fargo Mem.") at 11-12.  Although the initial interest rate was 7.875% and the rate was

adjustable, the rate could vary both downward and upward; indeed, in 2009-2010, the rate

adjusted as low as 5.625%.  Id.  Wells Fargo seems to suggest that it could not have had

"knowledge . . . that there was no reasonable probability of payment in full," D.C. Code § 28-

3904(r)(1), by Hughes because the required loan payments could have decreased.  Furthermore,

Wells Fargo contends that Hughes' allegation that he did not "receive substantial benefits," D.C.

Code § 28-3904(r)(2), from the loan is unsupportable from the record.  Wells Fargo notes that

the loan was applied to satisfy two outstanding mortgages on the property as well as more than

$15,000 in other outstanding debts and that Hughes received an immediate payout of more than

$60,000.  Wells Fargo Mem. at 12-13.  Wells Fargo observes that Hughes stated at his deposition

that he benefitted from the loan by receiving cash and having Wells Fargo become his mortgage

holder.  Id. at 13; see id. Ex. 12.  Relatedly, Wells Fargo maintains that Hughes cannot establish

that he suffered injury-in-fact from Wells Fargo's conduct because he benefitted from the loan,

including by the loan's decreasing interest rate.  Wells Fargo's Supplemental Mem. in Supp. of its

Mot. for Summ. J. [Docket Entry 134] ("Wells Fargo Suppl. Mem.") at 6-8.  Additionally, Wells

Fargo argues that there is no evidence that Hughes had an "inability . . . reasonably to protect his

interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to

understand the language of the agreement, or similar factors."  D.C. Code § 28-3904(r)(5).

Wells Fargo notes that Hughes is literate and educated and testified at his deposition that he

understood the details of the loan.  Wells Fargo Mem. at 15-17; see id. Ex. 12.

      With respect to the allegation that Wells Fargo misrepresented material facts about the

loan, Wells Fargo disputes that its agent made the relevant statement and argues that even if the

statement was made, it was neither material nor a representation of fact.  Wells Fargo contends

that the alleged statement — that Hughes should have been able to refinance the loan within two

years, before the interest rate adjusted — cannot be considered a representation of material fact

because it was a prediction about a future event.  Wells Fargo Mem. at 17-18.  Wells Fargo

argues further that the alleged statement was not material because the record indicates that

Hughes has not attempted to refinance the loan.  Id. at 18-19.

      Finally, Wells Fargo contends that Hughes concealed material facts about the previous

transaction on the Property (with Abell, Baltimore, and Modern Management) when entering

into the transaction with Wells Fargo.  Wells Fargo Suppl. Mem. at 7-8.  Wells Fargo argues on

the basis of this alleged concealment both that Hughes cannot show Wells Fargo caused any

harm to him — because it would not have entered into the loan if it had known the true

circumstances — and that Hughes should not be allowed to recover under the CPPA due to his

unclean hands.  Id.

iii.  Analysis of CPPA Claim

As indicated at the motion to dismiss stage, <u>see</u> <u>Hughes</u>, 794 F. Supp. 2d at 8, Hughes' claim is analogous to other CPPA claims that have been sustained in this Circuit, most notably in <u>Williams v. First Government Mortgage & Investors Corp.</u>, 225 F.3d 738 (D.C. Cir. 2000). There, the D.C. Circuit upheld a jury verdict finding that the defendant had knowledge that there was no reasonable probability of payment on a refinanced mortgage requiring 57% of the plaintiff's monthly income.  <u>See</u> 225 F.3d at 744; <u>see also</u> <u>Johnson v. Long Beach Mortgage Loan Trust 2001-4</u>, 451 F. Supp. 2d 16 (D.D.C. 2006) (declining to dismiss a complaint under section 28-3904(r)(1) alleging that loan payments would require more than half of the plaintiff's income).  Williams's "disposable income" (after accounting for $100 per month in health insurance) was no more than $1,200 a month and the monthly payment on his loan was $686, leaving "little more than $500 each month to buy necessities for himself and his dependents." 225 F.3d at 743-44.  The D.C. Circuit therefore found that "a reasonable jury could conclude that [the bank] made the loan to Williams knowing 'there was no reasonable probability of payment in full of the obligation.'"  <u>Id.</u> at 744 (quoting D.C. Code § 28-3904(r)(1)).  The court also noted that Williams had only a sixth-grade education, limited literacy, and an inability to understand basic mathematics.  <u>Id.</u> at 744-45.  The court therefore found that a reasonable jury "could conclude that Williams was unable fully to understand the transaction" and that the bank knowingly took advantage of his inability reasonably to protect his interests.  <u>Id.</u> at 744 (quoting D.C. Code § 28-3904(r)(5)).

Although the current facts are somewhat more favorable to Wells Fargo than were those in <u>Williams</u>, the Court finds that there is a genuine issue of material fact as to whether the Hughes-Wells Fargo transaction was unconscionable.  A reasonable jury could conclude that Wells Fargo knew that there was no reasonable probability of payment on the loan.  To be sure,

considering all the evidence in the record, especially Hughes' deposition testimony, the Court concludes that it would not be possible for a finder-of-fact to reasonably conclude either that Hughes did not receive a substantial benefit from the loan or that Hughes did not understand the transaction.  But as the Court has noted previously, "[t]he five factors by which the CPPA defines unconscionability are disjunctive and non-exhaustive."  Hughes, 794 F. Supp. 2d at 9.

According to the amended complaint, at the initial interest rate of 7.875%, Hughes was to pay $1,604.18 per month for this loan, amounting to approximately 46% of his monthly income of $3,511.83; indeed, Wells Fargo's underwriting documentation indicated that Hughes would be paying 53.69% of his gross monthly income.  Am. Compl. ¶ 38.  Hughes now indicates that, by his calculation (based on documents reviewed by Wells Fargo prior to the transaction), his net income was only $2093.89, making the loan payments 77% of his net income.  Pl.'s Mem. of P. & A. in Opp'n to Def. Wells Fargo's Mot. for Summ. J. [Docket Entry 115] ("Hughes Opp'n") at 14.  Putting aside the adjustable rate for a moment, the loan here required payment of more than the approximately half of "disposable income" noted in Williams — and payment of an amount that was substantially higher than the previous mortgage payments that Wells Fargo knew Hughes was having trouble making.  It is true that here Hughes received a substantial initial lump sum payment which, if spent wisely, could have been used to service the loan or pay other costs going forward.  Yet it is difficult to see why Wells Fargo and Hughes would have structured the loan in this manner if anyone expected Hughes to use the lump sum for later mortgage payments.  If this money was intended to be used for ongoing periodic payments, why pay substantial interest to receive the money as a lump sum?

As for the fact that this was an adjustable rate mortgage, it is hard to say that this aspect of the loan unequivocally favors either side, though the fact somewhat hurts Wells Fargo's case

for summary judgment.  Under the CPPA, the question is whether Wells Fargo knew there was

no reasonable probability of repayment at the time it made the loan.  For all Wells Fargo knew,

the interest rate could have gone up (as it initially did) or down (as it later did).  The Court has no

basis for knowing if one contingency was more likely than the other.  But given the

precariousness of Hughes' financial situation, the fact that the loan payments could have gone up

substantially should have been cause for concern.  Although the required payments could have

also decreased, it cannot be reasonable for a lender to rest hope of repayment on the contingency

that interest rates happen to fall.  In other words, the volatility in the loan's interest rate hurts

Wells Fargo's case because it added an element of chance to an already questionable situation.

In the Court's view, then, a reasonable jury could conclude that Wells Fargo had

knowledge at the time of the transaction "that there was no reasonable probability of payment in

full of the obligation by the consumer."  The mortgage was for approximately half of Hughes'

gross monthly income and certainly more than half of his net income, that income was not

extremely large, Hughes had trouble making even smaller payments in the past, and the

mortgage's interest rate could increase at any time.  The fact that Hughes received a large one-

time pay-out helps Wells Fargo's case, but whether it helps enough is a question of fact for a

jury.

The Court is also not persuaded by Wells Fargo's argument that Hughes' CPPA claim

must fail given his misconduct in entering into the transaction, either because his conduct

undermines any injury-in-fact or because of the doctrine of unclean hands.  With respect to

injury-in-fact, Wells Fargo confuses facts that may diminish or even eliminate Hughes' ability to

recover on his claim with facts suggesting Hughes has no standing to bring the claim in the first

place.  As Wells Fargo accurately notes, in <u>Grayson v. AT&T Corp.</u>, 15 A.3d 219, 246-47 (D.C.

2011), the D.C. Court of Appeals concluded that a plaintiff had no standing to bring a CPPA

claim because he could show no injury-in-fact.  But that plaintiff in Grayson did not claim to

have been personally injured by the defendant; rather, he "rest[ed] his claim entirely 'on the legal

rights or interests of third parties,'" and was "in no different a position to bring this claim than

any other unaffected third party."  Id. at 246-47 (quoting Warth v. Seldin, 422 U.S. 490, 499

(1975)).  Here, by contrast, Hughes and Wells Fargo entered into a transaction in which Hughes

claims that Wells Fargo injured him.  That alleged injury gives Hughes standing, in a very direct

way, to bring his claim.  Wells Fargo presents a colorable argument that Hughes was not, in fact,

injured by Wells Fargo in the transaction, but that is relevant to Hughes' ultimate success on the

merits of his CPPA claim, not to whether Hughes has standing to bring a claim about the

transaction, and is, in any case, a contested issue of fact for the jury.

Regarding Wells Fargo's contention that Hughes' "unclean hands" should bar his

recovery, the Court finds that such a defense is simply unavailable under the CPPA.  The Court

has previously noted that "the defense of unclean hands does not fit comfortably with alleged

violations of CPPA, which is a broad remedial statute intended to 'assure that a just mechanism

exists to remedy all improper trade practices.'"  Hughes, 794 F. Supp. 2d at 11 (quoting DeBarry

v. First Gov't Mortg. & Investors Corp., 743 A.2d 699, 700 (D.C. 1999)).  Further consideration

confirms the Court's earlier conclusion that a claim under the CPPA cannot be barred by the

plaintiff's own misconduct.

Wells Fargo confirmed at the hearing before the Court that it is not aware of a single case

in which a defense of unclean hands was accepted under the CPPA or a similar state statute.

Hughes notes that in Davis v. Wholesale Motors, Inc., 949 P.2d 1026, 1038-39 (Haw. Ct. App.

1998), the court concluded that such a defense was not available to a claim brought under the

comparable Hawaii statute, HRS § 480.  Davis noted that the Hawaii statute intended to follow comparable provisions of federal antitrust law, including providing for treble damages to encourage enforcement, and relied on Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139 (1968).  The Supreme Court concluded there that "[t]he plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition."  Perma Life, 392 U.S. at 139.

The Court finds this reasoning persuasive with respect to the CPPA as well. The purpose of the CPPA, as stated in the statute's text, is to "(1) assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices; (2) promote, through effective enforcement, fair business practices throughout the community; and (3) educate consumers to demand high standards and seek proper redress of grievances."  D.C. Code § 28-3901(b).  The statute is therefore intended to promote fair business practices in the community at large, not just to resolve individual disputes between consumers and businesses. Accordingly, the CPPA expressly indicates that conduct may constitute a violation "whether or not any consumer is in fact misled, deceived or damaged thereby,"  D.C. Code § 28-3904, and provides for the recovery of treble damages, D.C. Code § 28-3905(k)(1)(A).  Hence, as with federal antitrust law, the statute operates through private enforcement via suits by affected consumers, but the statute is concerned with the deterrence effect on the general business community as well as with making individual consumers whole.  That is why the statute allows for plaintiffs to recover treble damages and defines violations to include instances in which a consumer is not "in fact misled, deceived, or damaged."  D.C. Code § 28-3904.  Similarly, the

fact that an individual plaintiff may have engaged in inequitable conduct is not particularly relevant to the desired outcome of deterring unlawful behavior in the business community.

Hence, the doctrine of unclean hands should not bar Hughes' claims under the CPPA.  As discussed below, he did indeed make material misrepresentations to Wells Fargo when entering into the mortgage transaction.  Even so, it may still be the case that the transaction that Wells Fargo <u>thought</u> it was entering into was unconscionable on the terms of the contract as Wells Fargo understood them.  In other words, it is no defense for Wells Fargo to argue that it tried to enter into a possibly unconscionable contract, but was prevented from doing so by Hughes' fraud.  It is consistent both with the statute and with equity for Wells Fargo to be held to account for this behavior if it was, in fact, unlawful.

On the other hand, with respect to the misrepresentation of material fact claim under the CPPA, the Court now finds that Hughes' claim cannot be sustained.  The basis for Hughes' misrepresentation claim is that Wells Fargo's representative told him that "he did not need to worry about the loan being an adjustable-rate mortgage, because he should be able to refinance the loan before the rate changed," Am. Compl. ¶¶ 43-44.  The CPPA prohibits "misrepresent[ations] as to a material fact which has a tendency to mislead."  D.C. Code § 28-3904(e).  As a preliminary matter, Wells Fargo's statement was a suggestion about something that Hughes would be able to do in the future, rather than a statement about a "fact" in a literal sense.  <u>See</u> <u>Howard v. Riggs National Bank</u>, 432 A.2d 701, 706 (D.C. 1981) ("Opinions or predictions of future events do not constitute representations of material fact upon which a plaintiff successfully may place dispositive reliance.")  To be sure, Hughes' ability to refinance the loan was at least arguably in Wells Fargo's control, since Wells Fargo had the ability to renegotiate the loan's terms at a future date.  Strictly speaking, however, if Hughes had been

misled by Wells Fargo's statement about something Wells Fargo then failed to do in the future, Hughes would be detrimentally relying on an implicit promise by Wells Fargo, rather than a misrepresentation of a fact (i.e., a statement that was false at the time).  See id.  In any case, the distinction is not of much consequence here, since Hughes has never indicated that he actually tried to refinance the loan.  The statement was therefore not a misrepresentation because it might actually have been accurate.  There is no indication that Wells Fargo made the statement without intending it to be true; on the contrary, deposition testimony from Wells Fargo's representative suggests that it was Wells Fargo's standard practice to make loans of this sort with the intention of refinancing.  See Hughes Opp'n Ex. 48.  Hence, even if a statement about a future event that did not occur could be construed as a misrepresentation of fact, Hughes has presented no evidence that such a misrepresentation was actually made in this instance.

In sum, Hughes' claim under the CPPA may proceed, but in more limited form than alleged in the complaint.  Hughes' CPPA unconscionability claim may proceed on the ground that Wells Fargo had knowledge that there was no reasonable probability of payment in full of the obligation by Hughes.  But Hughes has presented insufficient evidence for a jury to reasonably conclude either that he did not understand the nature of the transaction with Wells Fargo or that he received no substantial benefit from the loan.  Hughes has also presented insufficient evidence, as a matter of law, that Wells Fargo made a material misrepresentation of fact to Hughes in the transaction, and hence that CPPA claim must be dismissed.

iv.  Hughes' Quiet Title Claim

Hughes seeks to quiet title against Wells Fargo on the ground that Wells Fargo obtained its security interest in the Property through unconscionable terms.  Am. Compl. ¶ 84.  As the Court noted previously, the quiet title count depends upon the outcome of the CPPA count.

Hughes, 794 F. Supp. 2d at 9.  Civil remedies available under the CPPA include "any [] relief which the court deems proper," which may include rescission.  D.C. Code § 28-3905(k)(1)(F). In addition, the Court's equitable powers allow it to quiet title in favor of Hughes if Wells Fargo's actions warrant that remedy.  Hence, it would be premature to dismiss Hughes's quiet title count while his CPPA unconscionability claim remains pending.  See, e.g., Armenian Genocide Museum and Mem'l, Inc. v. Cafesjian Family Found., Inc., 595 F. Supp. 2d 110, 119 (D.D.C. 2009) ("[I]t is premature to consider dismissal of [a quiet title count], which may or may not constitute an appropriate remedy depending on the evidence yet to be adduced in this case.")

b.  Wells Fargo's Counterclaims Against Hughes

Wells Fargo asserts five counterclaims against Hughes.  First, Wells Fargo claims that, under the doctrine of equitable subrogation, its lien should be subrogated to those of the prior secured creditors whose debts were satisfied by Wells Fargo.  Wells Fargo Countercls. Against Hughes ¶¶ 8-14.  Second, Wells Fargo contends that it is entitled to an equitable lien on the property for the full amount of its loan to Hughes.  Id. ¶¶ 15-17.  Third, Wells Fargo argues that Hughes was unjustly enriched at its expense.  Id. ¶¶ 18-24.  Fourth, Wells Fargo maintains that Hughes committed fraud against it by concealing material facts about his transaction with Abell. Id. ¶¶ 25-30.  Fifth, Wells Fargo contends that Hughes is in breach of his mortgage contract with Wells Fargo.  Id. ¶¶ 25-30.

The Court will consider each of Wells Fargo's counterclaims.  The Court notes at the outset, in all candor, that Wells Fargo's counterclaims against both Hughes and Abell are difficult to resolve prior to resolution of the dispute involving the earlier transaction between Hughes and Abell.  Hence, the Court is unable to presently resolve all of the matters that ultimately might warrant judgment in Wells Fargo's favor.

i. Hughes' Argument that Wells Fargo Abandoned its Counterclaims

As a preliminary matter, Hughes argues that Wells Fargo's counterclaims are not properly before the Court. Hughes accurately points out that Wells Fargo's counterclaims were included in the same document as its amended answer to Hughes' original complaint. Hughes Opp'n at 38. Hughes then filed an amended complaint, and Wells Fargo filed an answer to the amended complaint that did not include any counterclaims. Hughes argues that this superseding pleading nullifies the earlier document containing the counterclaims.

The Court finds that Wells Fargo's later filing did not abandon its counterclaims. To be sure, Hughes' argument has some force. Federal Rule of Civil Procedure 7 states that "[o]nly these pleadings are allowed" and then sets forth a list of pleadings that does not include counterclaims. Rule 13 requires that a counterclaim be set forth in a pleading. It would be reasonable to conclude from these two rules that a counterclaim is not a distinct pleading, but rather must be included as part of another pleading, such as an answer. And it is certainly true that "[o]nce an amended pleading is interposed, the original pleading no longer performs any function in the case." 6 Charles A. Wright, et al., Fed. Prac. & Proc. Civ. § 1476 (3d ed.). Accordingly, it is reasonable for Hughes to assert that when Wells Fargo replaced its answer with an answer that did not contain counterclaims, the pleading that was before the Court (the new answer) did not contain counterclaims.

Nonetheless, in the Court's view, this conclusion would put form over substance. An answer and a counterclaim, even if contained in the same document, serve different functions; the counterclaim shares more with a complaint, setting out claims against the other party, than it does with the answer. See Dunkin Donuts, Inc. v. Romanias, 2002 U.S. Dist. LEXIS 28405, at *5-6 (W.D. Pa. May 29, 2002). It was therefore reasonable for Wells Fargo to view the answer

and the counterclaims as separate pleadings.  That Wells Fargo intended the counterclaim as separate is confirmed by the fact that Wells Fargo did not continue the answer's paragraph numbering in the counterclaim.  It is not especially intuitive that a counterclaim is part of the pleading to which it is attached, nor is it obvious that counterclaims must be re-pled when an answer with counterclaims attached is superseded.  And Hughes does not indicate that he was actually under the impression that Wells Fargo had dropped its counterclaims and then took action accordingly, or that he is otherwise prejudiced in any way.  Hence, Wells Fargo should not be penalized for failing to restate the counterclaims when it superseded its answer.

ii.  Fraud Claim

The Court begins with Wells Fargo's fraud claim because resolution of the fraud claim affects resolution of the other issues.  Wells Fargo alleges that Hughes knowingly misrepresented that he owned the Property when he applied in 2006 for a "refinance" loan with Wells Fargo and that Wells Fargo relied upon his misrepresentation in evaluating and approving his loan application.  Wells Fargo Countercls. Against Hughes ¶¶ 26-28.  Wells Fargo argues that the record clearly and convincingly establishes that, prior to closing on the Wells Fargo transaction, Hughes was aware that he had sold his home, but failed to disclose this fact to Wells Fargo.  Wells Fargo Mem. at 32-33.  Wells Fargo contends that, prior to commencing the transaction, Hughes told Wells Fargo only that "a loan shark loaned [him] some money" to prevent foreclosure, and that Hughes further misrepresented to Wells Fargo that he possessed no other documents or information concerning his transaction with Abell, when in fact he possessed copies of the lease and option agreements.  Id.  Wells Fargo seeks judgment against Hughes in the full amount of the principal of the loan, $192,500, as well as punitive damages and fees and costs.  Wells Fargo Countercls. Against Hughes ¶ 30.  The principal of the loan was

approximately equal (though slightly greater) than the amount Wells Fargo paid out — the sum of the amount of the two prior liens on the property, which Wells Fargo paid off (approximately $105,000 in total), more than $16,000 in Hughes' unsecured debt, which Wells Fargo paid off, and the more than $60,000 lump sum that was disbursed to Hughes immediately.  Counterclaim ¶¶ 29-30.  Wells Fargo contends further that the document describing Hughes' contact with the Weinstock firm — the redacted document that the Court initially found protected by the attorney-client privilege, but later released to the parties when Hughes waived the privilege — indicates that "Hughes well understood that someone else was claiming ownership of the Property and that the Lease Agreement and Option Agreement were not only relevant, but integral" to the claim of ownership.  Wells Fargo Suppl. Mem. at 10-12.

The parties agree that the essential elements of common law fraud are:  (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) on which reliance is placed.  Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc., 878 A.2d 1226, 1233 (D.C. 2005); D'Ambrosio v. Colonnade Council of Unit Owners, 717 A.2d 356, 360-61 (D.C. 1998).  Fraud must be established by clear and convincing evidence.  Virginia Acad., 878 A.2d at 1233.

Hughes argues that he neither knew that he had transferred title to his home nor intended to defraud Wells Fargo.  He notes that the essence of his complaint against Abell, Modern Management, and Baltimore is that these defendants defrauded him out of title to his home.  Hughes Opp'n at 42-43.  Hughes also notes that he voluntarily disclosed his transaction with Abell to Wells Fargo and then, at Wells Fargo's suggestion, wrote a letter to Wells Fargo documenting the transaction and contacted the Weinstock firm in order to better understand the nature of the transaction.  Id. at 43.  Hughes contends that these actions both belie that he

intended to defraud Wells Fargo and confirm that he did not know that he had transferred title to his home.  Id. at 43-44.  Hughes argues that the document from the Weinstock firm "indicates confusion, not fraud."  Hughes Suppl. Mem. at 12-13.

Having reviewed the relevant documents and deposition testimony, the Court concludes that Wells Fargo has presented clear and convincing evidence that Hughes committed fraud against Wells Fargo and that no jury could reasonably find otherwise.  The record contains abundant evidence that Hughes understood, when he entered into the transaction with Wells Fargo, that Abell at a minimum purported to have gained ownership of the Property.  Because Hughes understood this information, the only conclusion that can reasonably be drawn from Hughes' repeated statements to Wells Fargo only that he had borrowed money to prevent foreclosure is that Hughes  intended to deceive Wells Fargo.  And since it is impossible to believe that Wells Fargo would have proceeded with a "mortgage" transaction if it had known that someone else was purporting to own the Property, Hughes' intentional misrepresentation to Wells Fargo was material to the transaction.

With respect to Hughes' understanding of his transaction with Abell, there are several documents in the record about which there is no dispute with respect to authenticity.  The documentation accompanying the Hughes-Abell transaction includes a document bearing the title "AGREEMENT TO SELL REAL ESTATE," which both Hughes (as seller) and Abell (as purchaser) signed.  See Wells Fargo Mem. Ex. 3.  In addition to a significant amount of printed text, this document contains handwritten text just above the signature line that states that "the property is transfer[red] as is," "the purchaser will lease to seller for one year," "the purchaser will transfer back to seller within one year for $175,000," and that "if the seller is 2 consecutive payments late the buy back is null & void."  Id.  The documentation further includes a "Lease

Agreement" and an "Option Agreement," both signed by Hughes, which refer to Hughes in many places as "Tenant" and Modern Management as "Landlord."  See id. Exs. 4, 5.  Accompanying this documentation is a note, in Hughes' handwriting, that states:  "My home, located at 5236 5th Street N.W., Washington, D.C. 20011-4043, is in foreclosure.  I sold my home, leased it back for one (1) year and allowed to repurchase my home during this year.  This allowed my family and I to stay in our home and an opportunity to buy it."  Id. Ex. 6.  The note is then signed by Hughes. Id.  The record also contains various receipts, apparently provided to Hughes by Modern Management, that refer to "rent" paid by Hughes for the 2005-2006 time period.  Id. Ex. 10.

Hughes has stated that he received copies only of the lease and option agreements, not the other documentation of his transaction with Abell, and that he believed his transaction with Abell was to obtain a loan.  See Hughes Opp'n at 42-43; Am. Compl. ¶¶ 20-21.  In Hughes' deposition, he testified that he "didn't read through [the sale] agreement" but instead "went mainly by verbal [statements] for what I was being explained by Calvin Baltimore and he seemed to be in a hurry so I trusted what I heard."  Hughes Opp'n Ex. 49.  Hughes further testified that he understood that he "was being loaned money in order to enable [him] to stay in the home" and that "the loan was to be repaid, the monthly payments, that included mortgage payments to Chase."  Id.  Hughes also testified that he did not read the documents that he signed and that he did not receive a copy of the documents.  Id.

The document from the Weinstock firm is entitled "Redacted Intake Notes Summary." Wells Fargo Suppl. Mem. Ex. S-1. The document appears to be a log of Hughes' interactions with the Weinstock firm and contains two unredacted entries.  The first entry, dated September 7, 2006 – approximately two weeks before the completion of the Hughes-Wells Fargo transaction – states:

Mbr made a loan from the O/P because he was about to lose the property.  Now Mbr is in better shape and can afford to pay his own mortgage (Chase Mortgage)[.] O/P is stating he cannot break contract with him because he owns the property from the lease he signed with him for the loan.  Mbr states he r'cvd about $60,000 but O/P is telling him he has to pay back $190,000 for the loan.  Mbr wanted to refinance with Wells Fargo and that how he found out that the O/P owns his house. Mbr states he isn't on the deed but does have a lease.

The second entry, dated October 23, 2006, states:

Mbr went over the whole story with me.  Mbr says that he did refi the house but that O/P still says that he owes them $$.  He apparently signed some docs back then that he does not have copies of.  My guess is that one was a Promissory Note.  There was no lien on the property.  He does have a tenant/LL agreement that he will rent the property back from the O/P.. ????.  That was going to pay the mortgage but now Mbr refi'd the house and he still has to pay the lease and the mortgage.  Mbr then adv that there is a lease purchase option attached to the doc.. ?? So . . what docs did he sign then, ??? Mbr will fax in docs and I will do a demand ltr to the O/P to ask for all docs rel to the transaction to see what is going on here.

Wells Fargo argues that the Intake Notes "further establish that Hughes committed fraud against Wells Fargo by failing to disclose material facts to Wells Fargo, which if disclosed would have resulted in cancellation of the loan."  Wells Fargo Suppl. Mem. at 4.  Hughes contends, however, that the notes only indicate Hughes' confusion about the prior transaction. Pl.'s Supplemental Mem. of P. & A. in Opp'n to Def. Wells Fargo's Mot. for Summ. J. [Docket Entry 139] ("Hughes Suppl. Mem.") at 2-5, 11-14.[1]

---

[1] Hughes further argues that the Intake notes are inadmissible because they are unreliable and represent multiple levels of hearsay.  Hughes Suppl. Mem. at 14-16.  Neither of these arguments has merit.  Hughes contends that the notes are unreliable because they reflect confusion and contain inconsistent statements.  Id. at 14-15.  But the inconsistencies in the notes can be taken into account in assessing their probative value.  There is no reason why the confusion reflected in the notes need bar their inadmissibility altogether.  Hughes further contends that the notes "present multiple levels of hearsay, as they purport to reflect the out of court statements of three different declarants: the intake screening person, Mr. Hughes, and O/P."  Id. at 15-16.  But Hughes himself seems to recognize that the hearsay of whomever wrote the notes is admissible under the business records exception.  Id. at 15.  And Hughes' own statements about the transaction are not hearsay at all, as they are not being admitted for their truth — that what Hughes said was true or that "O/P" actually said those things — but rather as evidence of what Hughes thought about the transaction when he spoke to Weinstock.  For example, even if Hughes were incorrect in his representation that "he isn't on the deed but does have a lease," that would nonetheless be probative of what Hughes thought at that time about whether he was on the deed.

There is not any significant dispute regarding what information Hughes conveyed to Wells Fargo about his transaction with Abell.  Hughes' amended complaint in this case indicates that he told Wells Fargo that he borrowed money to stop foreclosure — not that he sold his home or even that anyone else was asserting ownership of the Property.  Am. Compl. ¶ 34.  The letter Hughes wrote to Wells Fargo prior to the completion of the "refinancing" transaction accordingly states that Hughes "borrowed money to bring [his] property out of foreclosure and current, and ha[s] remained current to date."  Wells Fargo Mem. Ex. 28.  Hughes does not indicate that he ever stated anything else to Wells Fargo.

Upon consideration of the record, the Court concludes that a jury applying the clear and convincing standard of evidence could reasonably conclude only that Hughes committed fraud against Wells Fargo.  In light of the written documentation in the record, the Court finds that a finder-of-fact could not reasonably find Hughes' claims and accompanying testimony credible. The documents consummating the Hughes-Abell matter are extremely clear about the fact that the transaction was a sale of Hughes' home, and this fact is repeated in several instances.  Still, it might perhaps be conceivable that Hughes did not actually read these documents before signing them.  But there simply is no explanation for how a note describing the transaction in detail — including the words "I sold my home" — could be handwritten and signed by Hughes without Hughes at least comprehending how the other parties understood the transaction.  Even if Hughes did not himself have a copy of this documentation, he did have a copy of the "lease" and "option" agreements (each of which made clear that Abell now purported to own the property) and he received "rental receipts" for approximately the next two years.  Considering the handwritten note and these documents, which were, in fact, in Hughes' possession, it is simply not credible for Hughes to maintain that he did not understand the transaction initially or that he

did not receive any written documents clearing up his misimpression.  Furthermore, although Hughes may now dispute how the Weinstock document should be interpreted, he cannot deny that the document reveals, at the very least, that he knew Abell was <u>claiming</u> that he owned the Property at the time of the transaction with Wells Fargo.   And it is also clear that Hughes told a different, more complete version of the facts to Weinstock than to Wells Fargo.  Hence, the document from the Weinstock firm further confirms that Hughes knew that Abell was asserting ownership and yet he made no mention of that key fact to Wells Fargo.

The Court need not resolve the dispute about the transaction between Hughes and Abell — that is, whether Abell did, indeed, become the owner of the Property in that transaction — in order to conclude that Hughes misrepresented the facts, that the misrepresentation was material, or that Wells Fargo relied on the misrepresentation.  Wells Fargo has shown that Hughes knowingly made a representation that he knew to be false — that he previously had merely entered into a loan, rather than a transaction in which someone purported to gain ownership of the Property.  No reasonable jury could conclude otherwise under the clear and convincing evidence standard.  Whatever the resolution of the Hughes-Abell dispute, then, it cannot seriously be disputed that Wells Fargo would never have entered into the transaction with Hughes had Hughes honestly disclosed that he had entered into a transaction with another party through which that party claimed to have purchased the Property.  Hughes' strongest counterargument is that, due to his purported confusion about the transaction, Hughes had no intent to deceive Wells Fargo, but rather simply did not understand what information Wells Fargo would deem relevant to the transaction.  Intent is typically a difficult element to prove, requiring as it does the judging of not only a person's actions but his motivations.  But it is simply not credible that Hughes completed the transaction with Wells Fargo without

understanding the significance of someone else claiming ownership of the Property.  No jury

could reasonably conclude that Hughes made the misrepresentations with anything other than the

intent to deceive Wells Fargo. Since a jury could not reasonably conclude other than that Wells

Fargo has established a claim of fraud against Hughes by clear and convincing evidence, the

Court will grant summary judgment for Wells Fargo on this claim.  The Court notes that it is not

presently reaching a determination as to the damages Wells Fargo is entitled to on this

counterclaim.

iii.  Equitable Subrogation Claim

Wells Fargo argues that it "is entitled to be equitably subrogated to the lien position and

extent of the prior liens and deeds of trust" on the Property.  Wells Fargo Countercls. Against

Hughes ¶ 14.  Wells Fargo currently holds a note (mortgage) secured by a deed to the property.

Id. ¶ 10.  However, both Hughes and Abell contend that Wells Fargo's mortgage deed is invalid.

Hughes contends that his transaction with Wells Fargo violated the CPPA, and Abell contends

that Hughes did not own the property when he purported to enter into the transaction with Wells

Fargo.  Wells Fargo notes that its funds were used to pay off two prior liens on the Property, one

held by Chase Home Finance in the amount of $87,745.13 and one held by Independence

Financial Corporation in the amount of $16,755.03.  Id. ¶ 13; Wells Fargo Mem. at 30.  Wells

Fargo thus argues that, to the extent its deed of trust is ruled void, it is entitled to be equitably

subrogated — that is, to "step into the shoes" — of the prior liens on the property that were paid

off using its funds.  Wells Fargo Countercls. Against Hughes ¶ 14.  As a practical matter, this

would mean that Wells Fargo would receive a lien on the property in the amount of $104,500.46,

the sum of the amounts of the two previously-existing liens.  Wells Fargo Mem. at 30.  Wells

Fargo's crossclaim against Abell seeks equitable subrogation against Abell on the same logic if

Abell is ultimately found to be the owner of the Property.  Wells Fargo Cross-cls. Against Abell ¶¶ 21-27.

Abell's written briefing contends that Wells Fargo is not entitled to equitable subrogation because Wells Fargo had notice of the defects in the Property's title when it commenced the transaction with Hughes.  Def. Vincent Abell's Opp'n to Wells Fargo's Mot. for Summ. J. [Docket Entry 140] at 6.  However, at the motions hearing before the Court on February 24, 2012, Abell indicated that he did not object to Wells Fargo's equitable subrogation claim because, assuming that he owns the property, he should not receive a windfall of the prior liens being paid off at Wells Fargo's expense.  Hughes, however, does object to Wells Fargo's equitable subrogation claim.  He argues that it is premature for Wells Fargo to seek equitable subrogation before the Court has even made a determination as to the validity of Wells Fargo's mortgage deed.  Hughes Opp'n at 40.  Hughes contends further that equitable relief would be inappropriate because Wells Fargo allegedly violated the CPPA in making the mortgage, and a party is not entitled to equity if he has himself behaved wrongfully.  Id. at 40-41.

The Court is not inclined to accept Hughes' argument with respect to the alleged CPPA violation.  Hughes is essentially making the same argument that he urged the Court to reject with respect to his own CPPA claim, namely that unclean hands bars recovery.  To be sure, there may be a distinction between asserting that unclean hands bars an equitable remedy such as subrogation and claiming that inequitable conduct bars recovery under a statute such as the CPPA.  Nonetheless, having allowed Hughes to proceed on his CPPA claim despite his conduct, and considering the nature of that conduct, the Court is not inclined to bar Wells Fargo from receiving equitable subrogation of its loan, regardless of how the CPPA claim is ultimately resolved.  Prior to the events of this case, the Property was encumbered by two liens.  Wells

Fargo paid off those loans because, due to Hughes' fraud, it did not know that Abell was claiming ownership of the Property.  Even if Hughes were to prevail on a parallel (and therefore informally "offsetting") CPPA claim, there is simply no reason why the Property's current owner should take the Property unencumbered when Wells Fargo paid off the existing liens under fraudulent circumstances.  The Court believes that it is appropriate for Wells Fargo to have a lien on the Property in the amount of the two previously-existing liens that Wells Fargo satisfied, regardless of whether Abell or Hughes owns the Property and regardless of whether Hughes prevails on his CPPA claim.

Hughes is on somewhat firmer ground when he argues that it may be premature for the Court to grant equitable subrogation to Wells Fargo before it is determined whether Wells Fargo's mortgage deed is valid.  If Hughes prevails in his assertion of title over Abell, and if the CPPA claim does not ultimately require rescission of the Wells Fargo-Hughes transaction (either because the claim is unsuccessful or because that is not the appropriate remedy), Wells Fargo may well possess a valid mortgage on the property, making equitable subrogation unnecessary. Furthermore, even if the Wells Fargo-Hughes transaction is unwound, making equitable subrogation necessary, which of Wells Fargo's equitable subrogation claims should be granted (the one against Hughes or the one against Abell) will depend on the outcome of the Hughes-Abell dispute.

Under these circumstances, the Court is inclined to grant both of Wells Fargo's equitable subrogation claims with recognition that this issue cannot be resolved definitively separate from Hughes' ongoing claims against Wells Fargo and Abell.  Wells Fargo's motion for summary judgment will therefore be granted both as to Hughes and as to Abell, with the acknowledgment

that final judgment in this case with respect to equitable subrogation will ultimately need to account for the resolution of the other disputes, consistent with this Opinion.

iv.  <u>Equitable Lien and Unjust Enrichment Claims</u>

Wells Fargo contends that it should receive an equitable lien on the Property. Wells Fargo claims that "it would be improper and inequitable for Mr. Hughes to obtain a windfall by receiving an unencumbered interest in the Property or a priority interest in the Property" and that, therefore, "[s]hould Wells Fargo's lien be deemed void, then equity and the ends of justice require that the Court declare that Wells Fargo has an equitable lien securing its loan."  Wells Fargo Countercls. Against Hughes ¶¶ 16-17.  Hughes argues that Wells Fargo's violation of the CPPA should act as a bar to this equitable relief.  Hughes Opp'n at 41.

Even if Wells Fargo is not barred from seeking an equitable lien, considering the outcomes that now seem possible in this case, it is unclear to the Court how such a lien would make sense.  "Liens, whether equitable or legal, are merely a means to the end of satisfying a claim for the recovery of money."  <u>Dep't of Army v. Blue Fox, Inc.</u>, 525 U.S. 255, 262 (1999).  If Abell, rather than Hughes, is ultimately found to own the Property, Hughes' mortgage deed is probably invalid, since Abell was not a party to the transaction with Wells Fargo.  Under those circumstances, it is not clear why Wells Fargo would be entitled to an equitable lien as a claim against Hughes on a property that Hughes does not actually own.  If, on the other hand, the dispute between Hughes and Abell results in Hughes' ownership of the Property, then it is also not clear why an equitable lien would be appropriate.  An equitable lien would not be necessary, of course, if Wells Fargo's mortgage deed is valid.  And if the Wells Fargo-Hughes transaction violated the CPPA and the mortgage deed was deemed invalid on that ground, it is difficult to

see why a lien should be placed on the property to replace a transaction that was deemed unlawful.

Given this apparent uncertainty, the Court will now deny Wells Fargo's motion for summary judgment on this count.  If Wells Fargo can articulate a coherent rationale in support of an equitable lien at a later date, the Court will reconsider the issue at that juncture.

v.  Unjust Enrichment and Breach of Contract Claims

Wells Fargo claims that Hughes would be unjustly enriched to the extent that he is successful in any claim that Wells Fargo's mortgage deed is invalid.  Wells Fargo Countercls. Against Hughes ¶ 23.  Wells Fargo notes that it paid off the liens on the Property, as well as Hughes' unsecured debts, and seeks judgment for the sum total amount of this debt — $121,292.46, plus interest.  Id. ¶¶ 19-24.  Wells Fargo also asserts a claim for breach of contract, on the theory that if the mortgage note is in fact valid, Hughes is in default for the principal amount of $188,952.96, plus interest, fees, and costs.  Id. ¶¶ 31-37.

There can be no claim for unjust enrichment when an express contract exists between parties.  See Schiff v. AARP, 697 A.2d 1193, 1194 (D.C. 1997).  Wells Fargo's claims for unjust enrichment and breach of contract are therefore mutually exclusive; it cannot prevail on both claims.  Furthermore, both because Abell may actually own the Property and because rescission is a remedy available under the CPPA, it is still not clear whether Wells Fargo has a valid mortgage with Hughes.  On the other hand, given Hughes' conduct here, it would be inequitable for Hughes to have his debts paid off by Wells Fargo at no cost to him, even if Hughes has a parallel claim under the CPPA based on Wells Fargo's conduct.  Under these circumstances, the Court feels it is most appropriate to grant Wells Fargo's motion for summary judgment on the unjust enrichment claim, again with the understanding that final judgment in this case will

ultimately need to account for whether Wells Fargo has a valid contract with Hughes that makes this remedy inappropriate.[2]  But since the breach of contract claim is also tied up in Hughes' dispute with Abell, the Court will deny summary judgment on Wells Fargo's breach of contract claim.  Resolution of this count must wait for another day.

c.  <u>Wells Fargo's Crossclaims Against Abell and Abell's Crossclaim Against Wells Fargo</u>

Wells Fargo asserts four crossclaims against Abell, who in turn asserts one crossclaim against Wells Fargo.  First, Wells Fargo alleges that Abell defrauded Wells Fargo by intentionally failing to inform it that he held the deed to the Property and failing to record his deed for almost two years.  Wells Fargo Cross-cls. Against Abell ¶¶ 6-15.  Second, Wells Fargo seeks to quiet title against Abell on the ground that Abell obtained his deed from Hughes by improper means.  <u>Id.</u> ¶¶ 16-20.  Third, as noted above, Wells Fargo claims that, under the doctrine of equitable subrogation, its lien should be subrogated to those of the prior secured creditors whose debts were satisfied by Wells Fargo.  <u>Id.</u> ¶¶ 21-27.  Fourth, Wells Fargo contends that Abell has been unjustly enriched because Wells Fargo paid off the loans encumbering the Property.  <u>Id.</u> ¶¶ 28-33.  In turn, Abell's crossclaim against Wells Fargo seeks to quiet title on the ground that Abell's deed was recorded first in time to Wells Fargo's mortgage deed.  Abell Cross-cl. Against Wells Fargo ¶¶ 74-75.

i.  <u>Fraud Claim</u>

Wells Fargo alleges that Abell defrauded Wells Fargo by failing to inform it that he had a deed to the Property when he knew that Hughes was representing himself to be the owner of the Property.  Wells Fargo Cross-cls. Against Abell ¶¶ 9-11.  Wells Fargo also alleges that Abell intentionally failed to record his deed for almost two years so that Wells Fargo would believe

---

[2] If the Court ultimately concludes that there is a contract between Wells Fargo and Hughes, then under <u>Schiff</u> the judgment for unjust enrichment will have to be vacated.

Hughes was the record owner of the property. Id. ¶ 11.  Wells Fargo seeks a judgment against Abell in the amount of the principal of its loan to Hughes, $192,500, plus interest, punitive damages, and fees and costs.  Id. 15.  Abell responds that he was unaware that Hughes and Wells Fargo were entering into a "refinancing" transaction, but rather thought that Hughes was seeking a loan in order to exercise the "option" agreement between Hughes and Abell. Defendant/Counter-Pl./Cross-Pl. Vincent Abell's Mem. of P. & A. in Opp'n to Wells Fargo Bank, N.A.'s Mot. for Summ. J. [Docket Entry 116] ("Abell Opp'n") at 3, 6.  Abell further claims to have attempted to notify Wells Fargo of his claim of ownership of the Property by contacting the company that he believed was serving as title agent to the transaction. Id. at 3, 6-7.  Abell informed the Court at the motions hearing that the company has since gone out of business.

The Court finds that too many material facts are in dispute for summary judgment to be granted in Wells Fargo's favor on the fraud count.  It is certainly suspicious that Abell, after nearly two years, suddenly chose to record his deed to the Property one week before the Wells Fargo-Hughes transaction.  But Wells Fargo has not put forward concrete evidence that Abell knew the nature of its developing transaction with Hughes.  Abell's claims that he thought the transaction was, in fact, merely a loan and that he tried to notify a title company of his purported ownership are plausible, albeit questionable given the suspicious timing of his recording of his deed and the convenient fact that the company that he claims to have notified is no longer in operation.  Hence, Wells Fargo's motion for summary judgment will be denied on this count.

ii.  Quiet Title Claims

Wells Fargo seeks to quiet title against Abell on the ground that Abell improperly procured the deed from Hughes.  Wells Fargo Cross-cls. Against Abell ¶¶ 16-20.  In turn, Abell also seeks to quiet title against Wells Fargo on the ground that Abell's deed was recorded first in

time and is superior in title to the Wells Fargo deed of trust. Abell Cross-cl. Against Wells Fargo ¶¶ 74-75.  These quiet title counts depend on the outcome of the Hughes-Abell dispute, which is not the subject of Wells Fargo's motion for summary judgment. Wells Fargo may be entitled to a quiet title judgment against Abell, but that determination must await a finding that Abell improperly obtained the deed from Hughes.  Hence, it would be premature to grant either Wells Fargo's or Abell's quiet title counts.

iii.  Equitable Subrogation Claim

As discussed above, Wells Fargo claims that it would be inequitable for Abell to obtain a windfall from Wells Fargo paying off the two liens previously encumbering the property.  Wells Fargo Cross-cls. Against Abell ¶¶ 21-27.  As indicated above, at the motions hearing before the Court, Abell indicated that he acquiesces to Wells Fargo's equitable subrogation claim because he does not believe he is entitled to a windfall from Wells Fargo paying off the liens on the Property.

The Court agrees that Wells Fargo's claim of equitable subrogation should be granted, with the acknowledgment that final judgment in this case with respect to equitable subrogation will ultimately need to account for the resolution of the other disputes in the case, including disposition of the ownership of the Property.  The Court notes that while the text of Wells Fargo's crossclaim implies that the lien on the Property should be in the full amount of Wells Fargo's mortgage agreement with Hughes, Wells Fargo's briefing seems to suggest that the lien should be in the lesser amount of the encumbrances that Wells Fargo paid off (about $104,500). Compare Wells Fargo Cross-cls. Against Abell ¶ 27 with Wells Fargo Mem. at 39.  The amount of Wells Fargo's lien on the Property can be resolved at a later date based on the resolution of the other disputes.

iv.  Unjust Enrichment Claim

Wells Fargo alleges that Abell's failure to record his deed and "complicity in Hughes' misrepresentation of ownership of the Property" led to Wells Fargo satisfying the liens on the Property.  Wells Fargo Cross-cls. Against Abell ¶¶ 28- 33; see Wells Fargo Mem. at 39-40. Wells Fargo therefore seeks a judgment against Hughes for unjust enrichment in the amount of the liens that it paid off.  The Court agrees that Wells Fargo should receive compensation from Abell for paying off the liens on the Property if Abell is ultimately found to be the owner of the Property.  However, the Court believes it is more appropriate that Wells Fargo receive a judgment in the form of a lien on the Property, which can be paid off by Abell as a mortgage would, than a judgment in this amount against Abell.  Hence, the granting of Wells Fargo's equitable subrogation claim with respect to Abell makes this unjust enrichment claim unnecessary.  The Court will therefore deny Wells Fargo's motion for summary judgment with respect to the unjust enrichment claim against Abell.

d.  Abell's Renewed Motion for Summary Judgment

On April 20, 2012, Abell filed a renewed motion for summary judgment on all the remaining counts that Hughes alleges against Abell and Modern Management, arguing that the statute of limitations bars these claims.  Mem. of P. & A. in Supp. of Vincent Abell and Modern Mgmt. Co.'s (Renewed) Mot. for Summ. J. [Docket Entry 137] ("Abell Mem.").  Abell acknowledges that the Court previously rejected this argument, concluding that Hughes' allegations that defendants had concealed material terms of the transaction either obscured when Hughes' claims accrued or raised the possibility of equitable tolling of the statue of limitations. Hughes, 794 F. Supp. 2d at 12-13.  Abell states that he "respectfully disagrees" with these

conclusions.  Abell Mem. at 2-3. Hence, his motion is really a motion for reconsideration of the Court's previous decision.

Although there is no Federal Rule of Civil Procedure that expressly addresses motions for reconsideration, see Lance v. United Mine Workers of Am. 1974 Pension Trust, 400 F. Supp. 2d 29, 31 (D.D.C. 2005), because the Court's opinion did not fully adjudicate all the claims in the case, Abell's motion is properly characterized as a motion pursuant to Rule 54(b), see Fed. R. Civ. P. 54(b) (where court resolves "fewer than all the claims," it may revise "its opinion at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities").  "The Court has broad discretion to hear a motion for reconsideration brought under Rule 54(b)," Isse v. Am. Univ., 544 F. Supp. 2d 25, 29 (D.D.C. 2008), and reconsideration is appropriate "as justice requires," Cobell v. Norton, 355 F. Supp. 2d 531, 540 (D.D.C. 2005). "Considerations a court may take into account under the 'as justice requires' standard include whether the court 'patently' misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred." Williams v. Johanns, 555 F. Supp. 2d 162, 164 (D.D.C. 2008).  Review under Rule 54(b) "amounts to determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances." Cobell, 355 F. Supp. 2d at 540.

The essence of Abell's argument at this stage is that a reasonable person in Hughes' position would have been put on "inquiry notice" that Abell and Modern Management concealed material facts about the transaction.  Abell Mem. at 8-15.  Abell contends that even if Hughes believed, on the basis of Abell and Modern Management's alleged misrepresentations, that the transaction was a loan, not a sale, the other facts — such as the handwritten note in Hughes'

handwriting indicating that he "sold my home" — should have put him on notice that what had been represented was not quite right.  Id. at 7-12.  Abell maintains that a reasonable person under these circumstances was under an obligation to investigate further.  Id. at 12-13.

The Court will deny Abell's motion.  As a preliminary matter, the Court notes that the motion was filed well over a year after the Court's November 2010 decision and well after the deadlines for filing dispositive motions in this case.  Abell does not rely on any new facts in expressing his disagreement with the Court's prior decision.  Although the Court may, consistent with Rule 54(b), revise its opinion at any time prior to judgment on all claims in the case, fairness to the other parties suggests that the Court's prior decision should not be revisited so late in the day unless it was truly erroneous.  And here the Court believes its original decision was correct.  As indicated above, the Court believes that Hughes was at least aware that Abell was asserting ownership over the Property at the time of Hughes' transaction with Wells Fargo. Nonetheless, the Court notes that Hughes' claims against Abell, Modern Management, and Baltimore are not limited to injury from misrepresentations regarding who would own the Property after the transaction, but also include, for example, the allegation that there was a gross disparity between the price of the property or services sold and the value of the property or services sold.  See, e.g., Am. Compl. ¶¶ 50-55.  Misrepresentations made to Hughes by Abell or Modern Management may have concealed essential details of the transaction from Hughes that could be vital to his assertion of these claims.  Dismissal of Hughes' claims on the basis of the statute of limitations would therefore be inappropriate on the basis of the record at this time.

IV.  Conclusion

For the reasons described above, Wells Fargo's motion will be granted in part and denied in part.  Wells Fargo's motion will be denied with respect to Hughes' remaining claims against

Wells Fargo.  With respect to Wells Fargo's counterclaims against Hughes, Wells Fargo's motion will be granted with respect to the equitable subrogation claim (Count I), denied with respect to the equitable lien claim (Count II), granted with respect to the unjust enrichment claim (Count III), granted with respect to the fraud claim (Count IV), and denied with respect to the breach of contract claim (Count V).  With respect to Wells Fargo's crossclaims against Abell, Wells Fargo's motion will be denied with respect to the fraud claim (Count I), denied with respect to the quiet title claim (Count II), granted with respect to the equitable subrogation claim (Count III), and denied with respect to the unjust enrichment claim (Count IV).   With respect to Abell's crossclaim for quiet title against Wells Fargo, Wells Fargo's motion will be denied. Abell's renewed motion for summary judgment will be denied in its entirety.  A separate order has been issued on this date.

_____/s/_____<br>
JOHN D. BATES<br>
United States District Judge

Dated:  <u>June 7, 2012</u>