UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GEORGE R. HUGHES,

Plaintiff,

v.

VINCENT L. ABELL, et al.,

Defendants.

Civil No. 09-220 (JDB) (JMF)

**MEMORANDUM OPINION**

This case arises out of a lengthy dispute about the conveyance of a Washington, D.C., property. Extensive litigation resulted in a settlement agreement, which this Court approved. See Settlement & Dismissal Order [ECF No. 157]. That approval left open one issue: who is entitled to the settlement proceeds? The Court referred that question to a magistrate judge, who issued an order requiring anyone claiming an interest in those proceeds to file a statement of claim. See Jan. 18, 2013 Minute Order. The magistrate judge's commendable efforts in assessing those statements left two parties standing: Maria-Theresa Wilson ("Wilson") and Asset Lending Corporation ("Asset"). Wilson filed a motion for summary judgment and, after a round of briefing, the magistrate judge issued a Report and Recommendation granting the motion and finding that she is entitled to the funds. See Report & Recommendation [ECF No. 176] ("R&R"). Asset objected, and Jackson & Campbell, P.C. ("J&C") filed a motion to intervene in order to object. See Asset Objections [ECF No. 177]; J&C Mot. to Intervene [ECF No. 178]. After referring that motion to the magistrate judge, and following even more briefing, this Court adopted the magistrate judge's recommendation that J&C not be allowed to intervene—but the Court permitted J&C to file an amicus brief. See Mem. Op. [ECF No. 186]. Now before the

1

Court are [177] Asset's objections to the magistrate judge's recommendation that summary judgment be granted in favor of Wilson, and [188] [191] J&C's amicus briefs supporting Asset. For the reasons described below, the Court will accept the magistrate judge's recommendation and enter judgment in favor of Wilson.

**BACKGROUND**

The long history of this case is extensively detailed in several prior opinions of this Court and in the magistrate judge's thorough R&Rs. See, e.g., Mem. Op. [ECF No. 186] 1-4. The details salient to the resolution of Wilson's summary judgment motion are as follows. Under the terms of the settlement agreement reached by the parties and approved by this Court, Wells Fargo deposited $42,000 into the Court's Registry "for the benefit of the Abell Creditors." Settlement & Dismissal Order [ECF No. 157] at 2. When the magistrate judge called for statements from claimants, Wilson moved to intervene. See Wilson's Mot. to Intervene [ECF No. 155]. She did so because, back in 2007, she obtained a $2,060,000 judgment against Abell and others in D.C. Superior Court. R&R at 3. On July 24, 2007, she recorded that judgment with the D.C. Recorder of Deeds, placing a lien on Abell's properties in D.C. Id. Abell sought to stay the execution of that judgment pending appeal, and on June 3, 2008, after the D.C. Court of Appeals conditionally granted Abell's motion, a D.C. Superior Court judge set bond for the stay. Id. at 4. Wilson did not take any steps to alter the notice of judgment she filed with the D.C. Recorder of Deeds. Id. at 5.

While Abell's appeal was pending, Sophia Williams—not a party here—also obtained a judgment against Abell in unrelated litigation. Id. at 9. That judgment was recorded on June 2, 2010, and Asset maintains that it was then validly assigned the judgment, meaning that it has a lien against Abell as well. Id. at 9-10.

The D.C. Court of Appeals decided the appeal in Wilson's case on June 3, 2011. Id. at 5. Wilson recorded an amended judgment with the D.C. Recorder of Deeds on November 4, 2011. Id. Later that month, a Superior Court judge ordered that the "stay on execution and enforcement of the Judgment" was dissolved, and that Wilson could immediately proceed to collect on the judgment: hence her claim to the funds in the Court's Registry here. Id.

Wilson and Asset disagree about two things: (1) whether Williams properly assigned her judgment to Asset, and (2) the effect of the Superior Court's June 3, 2008 Order on Wilson's lien priority date. For Asset to be entitled to the funds, it must have been validly assigned the Williams judgment, and Wilson's lien priority date must be later than June 2, 2010 (in other words, it must be November 4, 2011, not July 24, 2007).

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 72(b), once a magistrate judge has entered his recommended disposition of a dispositive matter—such as Wilson's motion for summary judgment—a party may file specific written objections. Fed. R. Civ. P. 72(b)(2). The district court then "must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and may "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## **DISCUSSION**

Objectors[1] find two faults with the magistrate judge's R&R. First, they argue that Asset was validly assigned the Williams judgment in 2010. Second, they argue that Wilson's lien priority date is November 4, 2011, because of the June 3, 2008 Superior Court order. Objectors must be right on both counts for Asset to be entitled to the funds. The Court addresses objectors' arguments in turn.

### I.  ASSIGNMENT OF THE WILLIAMS JUDGMENT

Asset claims that it has priority because it purchased a judgment against Abell that was originally awarded to Sophia Williams in an unrelated matter before the D.C. Superior Court. R&R at 9. Williams recorded that judgment on June 2, 2010. Id. After realizing the difficulty of collecting from Abell, Williams decided to settle that case. She, Abell, another party called Modern Management Co.,[2] Asset, and JMW Settlements, Inc. (the "settlement servicer") signed a settlement agreement on May 3, 2011. Id. Asset, controlled by Abell's father, was involved in the settlement because Abell was already indebted to Asset, and Williams' judgment was purportedly preventing Abell from selling some property in order to pay back Asset. See Settlement Agreement [ECF No. 172-12] at 1 ("Williams Settlement"). Because the settlement involved a minor (Williams), it required court approval, see D.C. Code § 21-120(a); until the court approved the settlement, it was not fully effective. See Williams Settlement at 1-2. In summary, pursuant to the settlement agreement, Asset agreed to purchase the judgment from Williams; Asset would pay $100,000 to a settlement servicer, assigning Asset's obligation to pay Williams in the process; and Williams would assign the judgment to Asset. All of this was to

---

[1] Asset objected and J&C, not a party, filed an amicus brief in support of those objections. For convenience, the Court refers to both as "objectors."

[2] Modern Management Co. is not important for the purposes of this opinion.

happen after the court approved the settlement. The agreement did not impose any payment obligations on Abell. Id.

The court approved the settlement on July 8, 2011. R&R at 11. Asset paid the new settlement servicer, Metlife Tower Resources Group, Inc. ("Metlife").[3] Id. at 13. Then, on November 21, 2011, Williams assigned the judgment to Asset. Id. at 11. Asset thus believes it was validly assigned the judgment against Abell, June 2, 2010 lien priority date and all.

The magistrate judge thought otherwise because of one of the assignments contemplated in the settlement agreement itself. On June 27, 2011, before the parties moved to approve the settlement,[4] Abell,[5] Modern Management, Metlife, and Williams executed a "qualified assignment," which referenced the original settlement agreement. See Qualified Assignment [ECF No. 172-15].[6] Strangely, Asset was not a party to the qualified assignment, even though the settlement envisioned Asset paying a settlement servicer, who would then pay Williams. Id. at 1. The qualified assignment stated that Abell "has liability to make certain periodic payments to or for the benefit of" Williams. Id. This statement, however, did not accurately describe the settlement agreement, which provided that <u>Asset</u>, not Abell, was the only party with an obligation to make any payments to Williams. See Williams Settlement at 1-2.

Under the qualified assignment, Metlife purported to assume "all of [Abell's] liability to make" periodic payments to Williams, but nothing more. See Qualified Assignment at 1. For her part, Williams did not release Abell from all liability; she agreed only to "release[] and discharge[] [Abell] from all liability to make" periodic payments—to the extent he had any such

---

[3] It is unclear why Metlife was substituted for the previous settlement servicer.
[4] It is unclear whether the qualified assignment was actually executed on June 27, 2011, but the parties agree that it became effective on that date, as indicated in the assignment itself.
[5] It is unclear why Abell, not Asset, was a signatory to this assignment.
[6] One purpose of this assignment was to qualify for preferable tax treatment under Internal Revenue Code section 130 (hence the label "qualified assignment").

5

liability. Id. Substituting Asset for Abell, this assignment went as planned: Asset (Abell)[7] assigned its obligations to pay Williams to the settlement servicer; the next step was for Williams to assign the judgment to Asset.

The magistrate judge, however, found that because Abell had an obligation under the settlement agreement to make payments to Williams (which he did not), and because Metlife assumed that (nonexistent) obligation, Abell was no longer liable to Williams for anything. See R&R at 14. Thus, Williams' judgment was somehow rendered nugatory, so that when Williams assigned it to Asset, Asset received nothing. After all, it is elementary that an assignee can have no greater rights than those possessed by the assignor. See, e.g., LeRoy Adventures, Inc. v. Cafritz Harbour Group, Inc., 640 A.2d 193, 199 (D.C. 1994) (citation omitted). But the qualified assignment did not even involve the judgment. See Qualified Assignment at 1-4. It only involved Asset's[8] end of the deal—payment to the settlement servicer, who then assumed an obligation to pay Williams. Williams never assigned her judgment—her right to receive payment of $3,000,000, guaranteed by her right to enforce that judgment—until November 21, 2011, when she assigned it to Asset.[9] See Assignment of Judgment [ECF No. 174-2] at 29. Hence, when Williams assigned that judgment to Asset, Asset received Williams's right to enforce that judgment, along with the lien priority date, because Williams never did anything to extinguish her rights. The settlement agreement itself did not purport to extinguish the judgment or Williams's right to enforce the judgment, and it did not provide that the judgment would be satisfied even upon full execution of the settlement. To the contrary: it explicitly provided for the

---

[7] Much of the confusion likely results from Abell's apparent relation to Asset, controlled as it is by his father.

[8] Again, even though Asset was not a party to the qualified assignment, Asset was the party purchasing the judgment in exchange for payment to Williams through the settlement servicer.

[9] The qualified assignment itself also supports this conclusion: in it, Williams expressly covenanted that she "ha[d] not done and will not do anything to hinder or prevent [Asset] from enforcing the judgment." See Assignment of Judgment [ECF No. 174-2] at 29.

sale of Williams judgment to Asset. Williams Settlement at 1. And the settlement agreement did not release Abell from any obligation to pay that $3,000,000 judgment. Nor did the misconceived qualified assignment do so.[10]

The magistrate judge also viewed the parties' motion for approval of the settlement as evidence that the judgment against Abell was extinguished before it was assigned to Asset. See R&R at 11. That motion (but not, as the magistrate judge pointed out, the proposed order signed by the judge) stated that under the settlement "Abell shall assign the obligation for the future payments" to Metlife, that Metlife would be the sole obligor "with respect to the future payments," and that "Abell shall be fully released, said release being final." Consent Mot. for Approval [ECF No. 172-13] 4-5 (emphasis added). Once again, Abell had no obligation for future payments under the settlement. And Metlife becoming the sole obligor for "future payments" under the settlement agreement did not affect Abell's obligation to pay the judgment. See Qualified Agreement at 1. Further, the parties' representation in a motion—not an agreement—that Abell would be fully and finally released simply misrepresents the effects of the settlement. As the settlement itself explains, "it is in the best interest of [Asset] to purchase the Judgment from Plaintiffs . . . and [Asset] has offered to purchase the Judgment for the sum of [$100,000]." Williams Settlement at 1. Nowhere does the settlement purport to release Abell from liability for the judgment or to oblige him to make payments. Rather, it was deliberately structured in way that would give Asset the judgment against Abell, and Asset (controlled by Abell's father) presumably would not enforce it—in that way, "releasing" Abell from liability to Williams.

---

[10] The magistrate judge also concluded that Abell was released from "any liability to do anything the moment" the qualified assignment was executed. See R&R at 14. But the qualified assignment purports to release Abell only from "all liability to make the Periodic Payments," not from the judgment itself. See Qualified Assignment at 1.

7

The structure of the settlement also precludes a finding that the judgment was extinguished when Abell "assigned," for tax reasons, an obligation to make future payments. Abell did not offer to compromise the judgment for $100,000 in return for satisfaction of the judgment or for a liability release. Instead, Asset, a third party, offered to purchase the judgment from Williams for $100,000, which it would pay through another third party settlement servicer, who would assume the obligation to pay by executing a qualified assignment. Asset's (or Abell's) sloppy efforts to pay Williams through the settlement servicer—in other words, to hold up its end of the bargain—did not extinguish the very judgment that it was trying to purchase. Those efforts merely gave Metlife the responsibility to pay Williams, who was still obligated to assign the judgment to Asset.

In sum, Williams took no action to extinguish or assign her judgment until November 21, 2011. The qualified agreement made no mention of that judgment and purported only to affect rights under the settlement agreement—but not Asset's or Williams's rights. Abell may have attempted to release himself from his obligation under the settlement agreement to make payments to Williams by executing the qualified assignment, but Asset, not Abell, was the party obligated to pay Williams. And at no point did anyone attempt to assume Abell's obligation to pay the <u>judgment</u>, as opposed to payments under the settlement. Metlife attempted only to assume Abell's (really, Asset's) obligation to pay the sale price of the judgment. Hence, when Williams assigned the judgment to Asset—<u>just as the settlement contemplated</u>—Asset became entitled to enforce that judgment against Abell. Importantly for this case, with the judgment came Williams's lien priority date of June 2, 2010, as will now be explained.

## II. THE EFFECT OF THE SUPERIOR COURT'S JUNE 3, 2008 ORDER ON WILSON'S LIEN PRIORITY DATE

Even though Williams validly assigned her judgment to Asset, giving Asset a lien priority date of June 2, 2010, if Wilson is correct that her lien priority date is actually July 24, 2007, she is entitled to the funds in the Court's registry. See Fidelity Nat'l Title Ins. Co. v. Tillerson, 2 A.3d 198, 201 ("It is axiomatic that a prior lien gives a prior legal right ('first in time, first in right') . . . ."). And she is correct.

Asset contends that Wilson's lien priority date is November 4, 2011, the date she recorded an "Amended Judgment" after the D.C. Court of Appeals affirmed the judgment, not July 24, 2007, the date she first recorded her judgment with the D.C. Recorder of Deeds. If true, Asset has a superior claim to the funds in the Court's Registry because it has an earlier lien priority date. Asset does not dispute that Wilson recorded her judgment with the Recorder of Deeds in 2007. Instead, it argues that the Superior Court entered an order in 2008 that effectively erased her 2007 priority date. If that is true, then Wilson's priority date is November 4, 2011.

Some more background is necessary to understand Asset's argument. In Wilson v. Abell, No. 04-7270 (D.C. Sup. Ct. 2007), an unrelated matter, the D.C. Superior Court entered judgment for Wilson. She recorded that judgment on July 24, 2007. Abell then moved for the Superior Court to stay the execution of that judgment while he appealed. See Wilson's Mot. for Summ. J. [ECF No. 172] 2; D.C. Ct. App. Rule 8(a)(1). After the Superior Court demanded that Abell post a bond of $1,000,000, Abell turned to the D.C. Court of Appeals. See Aug. 22, 2007 Sup. Ct. Order [ECF No. 172-2]; Abell's Emergency Mot. for Stay [ECF No. 172-3] ("Emergency Stay Mot."); D.C. Ct. App. Rule 8(a)(2). That court granted Abell's motion "contingent upon [Abell] posting bond in an amount to be set by the Superior Court after it has reconsidered its previous bond in light of the relevant authorities." See Mar. 10 D.C. Ct. App.

Order [ECF No. 172-4]. The Superior Court heard argument and determined that Abell should post a $300,000 bond, and entered an order. June 3, 2008 Sup. Ct. Order [ECF No. 172-5] ("June 3, 2008 Order"). The effect of that order is at the core of the parties' dispute. As relevant here, the Superior Court ordered as follows:

- "To the extent [that Wilson's judgment] constitutes a lien on [Abell's] real or personal property . . . such lien shall be, and hereby is, vacated as to all real and personal property . . . in . . . the District of Columbia";

- "[Wilson] shall promptly rescind and withdraw any Notices of Judgment or other lien-creating filings in . . . the District of Columbia and shall not take further actions to enforce any judgment against [Abell] until further Order of the D.C. Court of Appeals, or if remanded, this Court";

- "Wilson shall not have any lien on any real or personal property of [Abell] arising out of or in connection with this matter until further order of the D.C. Court of Appeals, or if remanded, this Court"; and

- "Abell shall be authorized and permitted to convey fee simple title to real or personal property in . . . the District of Columbia free and clear of any lien or other cloud on title created or supposed by virtue of [Wilson's] judgment."

June 3, 2008 Order at 2. Asset argues that the plain language of the order vacated Wilson's lien and, with it, Wilson's lien priority date. Wilson counters that because the order did not vacate the judgment, under D.C. Code § 15-502 the lien continued, and hence so did her 2007 priority date.

The magistrate judge found that the Superior Court judge did not have the authority under D.C. law to issue an order vacating the lien, and so the order did not affect Wilson's lien priority date. See R&R at 9. Objectors urge this Court to reject that determination as violative of the Rooker-Feldman doctrine. Asset also continues to press its theory that the order changed Wilson's lien priority date to November 4, 2011. And objectors contend that upholding the magistrate judge's report and recommendation will cloud the titles of the many properties Abell transferred while his appeal was pending in Wilson v. Abell. Objectors are incorrect on all these points.

## a. Rooker-Feldman Doctrine

The Court turns first to whether adopting the magistrate judge's determination would violate the Rooker-Feldman doctrine. That doctrine, while jurisdictional, is statutory rather than constitutional: because 28 U.S.C. § 1257 provides that the United States Supreme Court has jurisdiction over appeals from any state's highest court,[11] lower federal courts may not sit in review of state-court judgments. As the Supreme Court recently explained, the "doctrine applies only in 'limited circumstances,' where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court." Lance v. Dennis, 546 U.S. 459, 466 (2006) (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291 (2005)). But here objectors do not argue that this Court lacks jurisdiction or that Wilson seeks to overturn an unfavorable Superior Court decision. Wilson is not a "state-court loser" asking for this Court to reject the Superior Court's judgment; that court simply never addressed the issue that is now before this Court. See Exxon Mobil, 544 U.S. at 284. Rather, she asks the Court to reject objectors' analysis of that decision's effects under D.C. law. To determine the narrow issue before it—which party has an earlier lien—this Court must necessarily determine the effect of the Superior Court's order. On its face, then, this case does not fit into the Rooker-Feldman paradigm.

The circumstances are closer to a different situation discussed in Exxon Mobil, but even that situation is distinguishable. There, the Supreme Court recognized that if a federal plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." Exxon Mobil, 544 U.S. at 293. Wilson has undoubtedly presented an independent claim, the success of which

---

[11] Section 1257 expressly includes the D.C. Court of Appeals in this category. See 28 U.S.C. § 1257(b).

11

depends on how a "state" court's order affected her rights. But, as she correctly points out, the Superior Court never reached any legal conclusion on the specific issue of lien priority, and it did not decide to erase Wilson's lien priority date. In claiming that she has an earlier lien priority date, then, Wilson does not deny a legal conclusion reached by the Superior Court.

Objectors seem to contemplate that the Rooker-Feldman doctrine precludes a district court from merely interpreting the state-law effect of a state-court order. But analysis of an order's effects is not the same as the appellate review prohibited by Rooker-Feldman. See Exxon Mobil, 544 U.S. at 291. This Court's only task is to determine whose lien takes priority, a narrow issue that has never been decided by any court. It depends on a determination of how the Superior Court's order affected the parties' relative rights—a matter not previously litigated—and does not depend on whether the order was correct, nor does it require that order to be "nullif[ied]," as amicus contends. See Amicus Reply to Wilson's Opp'n Brief [ECF No. 191] ("Amicus Reply") 3. Hence, without offending Rooker-Feldman, the Court may permissibly determine whether, under D.C. law, the Superior Court's order affected Wilson's lien priority date.

### b. The Effect Of The Superior Court's Order On Wilson's Lien Priority Date

What, then, was the effect of the Superior Court's order? Viewed in the proper context, it operated only as a stay on the execution of Wilson's judgment. Recall that after Wilson won a judgment and recorded it with the Recorder of Deeds, Abell moved the Superior Court for a stay pending appeal. That court set the bond too high for Abell's tastes, and so he moved the D.C. Court of Appeals—at which his appeal was pending—for a stay pending appeal. In his motion, Abell requested "an emergency stay of the execution of any attempts and/or proceedings to execute and/or enforce the judgment . . . ." Emergency Stay Mot. at 1. He cited D.C. Court of

Appeals Rule 8, "Stay or Injunction Pending Appeal," id. at 1, and requested a lower bond under Rule 8(b), which permits the court to impose conditions necessary "to prevent irreparable injury" and "[t]o preserve the status or rights of parties until the appeal is concluded," see D.C. Ct. App. Rule 8(b)(1).

The D.C. Court of Appeals granted the motion, "contingent upon the appellant posting bond in an amount to be set by the Superior Court after it has reconsidered its previous bond amount in light of the relevant authorities." Mar. 10 D.C. Ct. App. Order [ECF No. 172-4] 2. Then came the disputed Superior Court order. As relevant here, that order provided that if Abell timely posted the bond, any lien created by Wilson's judgment would be vacated and Wilson would have no lien on any of Abell's property; that Wilson had to remove any lien-creating notice of judgment; that Wilson could not take any actions to enforce the judgment; and that Abell could sell his properties free of any lien created by Wilson's judgment.

Irrespective of the language in the order, the sequence of events makes clear the purpose for which the D.C. Court of Appeals, after conditionally granting Abell's motion for a stay, referred the case back to the Superior Court: to set an appeal bond at an appropriate level. See Mar. 10 D.C. Ct. App. Order [ECF No. 172-4]. Under D.C. law, the Superior Court could not, pursuant to that referral, have modified or vacated the judgment itself, which Abell had appealed. See In re Estate of Green, 896 A.2d 250, 254 n.6 (D.C. 2006) (noting that "appellate jurisdiction only divests a trial court of jurisdiction to hear matters relating to those issues on appeal") (citation omitted); Stebbins v. Stebbins, 673 A.2d 184, 190 (D.C. 1996) ("It is clear, for example, that 'a party may seek disposition in the trial court of other matters which do not result in revocation or alteration of the judgment on appeal.'" (citing Padgett v. Padgett, 478 A.2d 1098, 1100 (D.C. 1984) (per curiam))) (emphasis added); In re S.C.M., 653 A.2d 398, 403 n.6 (D.C.

13

1995) ("Although the trial court lacks jurisdiction to modify an order from which an appeal has been taken, it retains jurisdiction to enforce it." (citing Floyd v. Leftwich, 456 A.2d 1241, 1243 (D.C. 1983))). In other words, the D.C. Court of Appeals had jurisdiction over the case, but it referred a single issue to the Superior Court for resolution: the level at which to set bond. So even if Abell had asked the Superior Court to alter or vacate the judgment—which he did not— and even if that court's order purported to do so—which it did not—that court lacked jurisdiction to affect the judgment while Abell's appeal was pending.

That absence of jurisdiction turns out to be crucial: under D.C. Code § 15-102, a final judgment constitutes a lien on all real property in the District of Columbia "from the date such judgment . . . is filed and recorded in the office of the Recorder of Deeds of the District of Columbia." §§ 15-102(a), (a)(1). That lien remains in effect "as long as the judgment . . . is in force or until it is satisfied or discharged." § 15-102(b). Abell did not ask the Superior Court to vacate, satisfy, discharge, or in any way affect the judgment itself. Instead, he asked the D.C. Court of Appeals to stay Wilson's ability to execute the judgment. See Emergency Mot. at 1. And that is exactly what the Superior Court did: stay the execution of the judgment, without purporting to vacate or in any other way affect the judgment.

Not only that, but Abell specifically represented to the D.C. Court of Appeals that entering a stay "will not irreparably harm [Wilson's rights], as she will simply be delayed from collecting her money damages . . . ." Emergency Stay Mot. at 39; see also D.C. Ct. App. Rule 8(b)(1) (rule under which Abell moved, permitting court to impose conditions necessary "[t]o preserve the status or rights of parties until the appeal is concluded"). Trading a 2007 lien priority date for a 2011 lien priority date against a judgment debtor with an ever-growing list of

14

creditors is very nearly the definition of irreparable harm, and trading 2007 for 2011 does not preserve the status quo while the appeal is pending.

Examining the language of the order does not change this assessment. Nowhere does the order purport to affect the judgment. It addressed only the execution of the judgment and the lien created by the judgment. But, as section 15-102 confirms, that lien continues so long as the judgment remains in force. See D.C. Code § 15-102; Fidelity Nat. Title Ins. Co. of N.Y. v. Tillerson, 2 A.3d 198, 201 n.13 (D.C. 2010).[12] And Wilson never removed the lien-creating notice that she recorded with the D.C. Recorder of Deeds in July 2007. See R&R at 5.

To sum up: under D.C. law, Wilson's lien continued so long as her judgment remained in force; Abell did not ask any court to vacate that judgment; no court purported to vacate that judgment; under D.C. law the Superior Court could not have altered the judgment; and in moving for a stay (only of the judgment's execution) Abell specifically represented that Wilson's rights would not be irreparably harmed. Hence, under D.C. law, Wilson's lien continued, and her lien priority date of July 24, 2007 survives. This is not to say that the Superior Court's order was ultra vires; Abell simply misperceives the effect that order had on Wilson's lien priority date under D.C. law.

c.  **Policy Concerns Raised By Objectors**

Objectors fret that affirming the magistrate judge's report and recommendation could create a cloud on the titles of twelve D.C. properties conveyed by Abell to third parties between June 3, 2008, and November 4, 2011. After all, the Superior Court's order stated that "Abell

---

[12] Asset also argues that a Maryland case—persuasive on matters of D.C. law, derived as it is from the common law of Maryland, see Woods v. United States, 65 A.3d 667, 671 n.8 (D.C. 2013)—Schlossberg v. Citizens Bank, 672 A.2d 625 (Md. 1996), supports its argument. It does not. That case holds that under Maryland law, when a court "opens" (as opposed to "modifies" or "vacates") a confessed judgment, the underlying judgment lien remains valid unless the judgment itself is "expressly vacated." 672 A.2d at 628-30. Similarly here, when a court stays a judgment—and does not vacate it—the underlying lien created by the judgment remains valid. See D.C. Code § 15-102.

shall be authorized and permitted to convey fee simple title to real or personal property in . . . the District of Columbia free and clear of any lien or other cloud on title created or supposed by virtue of [Wilson's] judgment." June 3, 2008 Order at 2. To begin with, neither Asset nor J&C has standing to assert the rights of those title holders, so this alone cannot be grounds for relief. Cf. Warth v. Seldin, 422 U.S. 490, 499 (1975) (a "plaintiff must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Further, this Court holds that Wilson's lien priority date is July 24, 2007, but it does not decide whether those twelve conveyances were nonetheless free and clear of any lien or cloud on title under D.C. Code § 15-102. If that issue ever does arise, it will be for another court to decide.[13] This Court holds only that Wilson's lien, created when the judgment was recorded on July 24, 2007, has priority over the Williams judgment owned by Asset. The Court expresses no opinion on whether Wilson's lien encumbered those other properties. And the Court does not adopt the magistrate judge's finding that the Superior Court's order was ultra vires, nor does the Court in any way "nullify" that order—the Court merely interprets it as not affecting Wilson's lien priority date, nothing more. See R&R at 9; Amicus Reply at 3.

Hence, because Wilson's lien priority date is July 24, 2007, she has priority over Asset (with a lien priority date of June 2, 2010) to the funds in the Court's Registry.

---

[13] Objectors argue that because "the lien . . ., in real time, did not exist from June 3, 2008 to November 4, 2011," the third parties could not have known that the properties might be encumbered. See Amicus Response to R&R [ECF No. 188] 3. But objectors admit that Wilson never sought to rescind or withdraw the notice of judgment she filed with the D.C. Recorder of Deeds; objectors do not argue that when Abell conveyed the twelve properties that the notice was not still on file there. So someone looking to purchase one of those properties between 2008 and 2011 would presumably have taken a trip to the Recorder of Deeds' office, found the notice of judgment, looked to D.C. Code § 15-102, and queried whether the Superior Court's order affected Wilson's lien priority date or whether it simply prevented Wilson from executing the judgment for the duration of the stay.

## CONCLUSION

For the foregoing reasons, the Court adopts certain recommendations in the magistrate judge's Report and Recommendation, and hence it will grant Maria-Theresa Wilson's motion for summary judgment. A separate order has issued on this date.

/s/  
JOHN D. BATES  
United States District Judge

Dated: April 30, 2014